*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0328p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
                              *Plaintiff-Appellee,*

                    *v.*                                          No. 09-3276

OSCAR WELLS,
                              *Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 07-00543-002—Solomon Oliver, Jr., Chief District Judge.

Argued: August 4, 2010

Decided and Filed: October 12, 2010

Before: SILER and SUTTON, Circuit Judges; CLELAND, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Joan E. Pettinelli, WULIGER, FADEL & BEYER, Cleveland, Ohio, for Appellant. Daniel R. Ranke, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Joan E. Pettinelli, WULIGER, FADEL & BEYER, Cleveland, Ohio, for Appellant. Daniel R. Ranke, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

———————————

## OPINION

———————————

CLELAND, District Judge. Defendant-Appellant Oscar Wells was convicted of conspiracy to violate, and three counts of substantive violations of, the Hobbs Act, 18 U.S.C. § 1951. Wells was the "Water Pipe Repair Supervisor" at the Cleveland,

---

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

Ohio, Water Department, whose duties included supervising the city's various repair and replacement contracts undertaken by private entities and individuals. Wells was convicted for his immersion in a scheme that noticeably improved his 2003 income by the solicitation and acceptance of about $40,000 in bribes paid by two contractors in return for channeling projects to them. Wells appeals, alleging prosecutorial misconduct and ineffective assistance of counsel. We **AFFIRM**.

## I. BACKGROUND

On October 24, 2007, Wells ("Defendant") was charged in a five-count indictment consisting of one count of conspiracy to commit bribery (count 1), in violation of the Hobbs Act; three counts of bribery (counts 2, 4, and 5), also in violation of the Hobbs Act; and one count of conspiracy to commit money laundering (count 3). Counts 1-3 involved activities with coconspirators and testifying witnesses, Jimmy Gates and Liberator Noce. Gates and Noce both cooperated with the Government, testified against Defendant, and received beneficial plea agreements from the Government. Counts 4-5 involved conduct with Larry Insana. Defendant's trial began on September 30, 2008, and on October 3, 2008, the jury returned a guilty verdict on all counts. The district court, however, granted Wells's motion for judgment of acquittal on count 3 on October 10, 2008. Defendant filed a motion for a new trial based on newly discovered evidence on October 15, 2008, which the district court denied on March 9, 2009, the same day Defendant was sentenced. Judgment was entered on March 11, 2009; Defendant timely appealed on March 12, 2009.

Defendant's activities as "Water Pipe Repair Supervisor" at the City of Cleveland Water Department ("the Water Department"), included supervising repair and replacement contracts such as those involving Noce and Insana. Defendant solicited, and Noce paid, bribes totaling around $40,000 during 2003. The thrust of the scheme was that Defendant would direct legitimate city work to Noce; Noce would improperly inflate the cost of the work and pass the excess charges on to Defendant as bribes. Defendant and Noce would meet weekly to discuss reconciling the Department's "job cards" with Noce's records and invoices. It was one of Defendant's job duties to ensure

that the work performed by contractors matched what was charged by them. Gates was Defendant's supervisor. According to Gates, he eventually became suspicious of some of the line items being charged by Noce, and he confronted Defendant. Defendant suggested that Gates join the bribery scheme and that Defendant would split the bribes with Gates. Noce's testimony was to some extent inconsistent with Gates's explanation. Noce testified that the first time Defendant sought a bribe from him, Noce reported it to Gates, who did nothing. The three eventually met in person and outlined the details of the plan: Noce would inflate his charges, and pass the inflated amount on to Defendant, who would then split the money evenly with Gates. Initially, Noce would deliver the bribes in cash to Gates or Defendant. Gates testified that Noce said he did not want to pay income taxes on the inflated amounts and wanted to deduct the bribes as business expenses. Accordingly, he asked if he could pay the bribes in checks. Noce testified that his suggestion to pay by check was an attempt to discourage Defendant and Gates from continuing the bribery scheme. Defendant refused to accept checks, but Gates accepted four checks in 2003. On the days that Gates cashed the checks, Defendant's banking records showed cash deposits in amounts roughly equal to what would be expected to be his share of the bribes. Eventually, the parties to the bribery scheme became aware of a law enforcement investigation. Gates testified that, during initial interviews with the FBI, he lied and tried to coverup the scheme. Gates also actively attempted to stymie the investigation. He sent letters to Noce and Defendant stating that he wanted to "make sure they were all on the page" and expressing concern over the FBI investigation. Eventually, Gates decided to cooperate with the FBI and came clean. On the other hand, Noce, according to his testimony, cooperated with the FBI and told them "what [he] told the jury" at trial. Defendant argues that this testimony is inconsistent with what Noce originally told the FBI, and cites FBI reports which were not a part of the district court's record. The reports are the subject of Defendant's motion to supplement the record, and are relevant only to Defendant's argument that his counsel was constitutionally defective for failing to impeach Noce with the prior inconsistent statements made to the FBI.

The Government also showed that Defendant took bribes from Larry Insana, another contractor. Insana testified that, on two occasions, he bribed Defendant to receive work from the Department. Insana also testified that he had a prior business relationship with Noce. He stated that the business partnership ended in 1986 because of a falling out with Noce, and that they did not speak again until roughly 1994. After the end of the trial, defense counsel discovered evidence suggesting that Insana and Noce started a business together in 2003 to purchase real estate. They each invested $30,000 in an LLC, which was organized to purchase undeveloped land, where a warehouse was built. Upon the leasing of the warehouse, Noce was supposed to buy out Insana's share in the LLC for $150,000. Based on this evidence, Defendant moved for a new trial; the district court denied[1] the motion.

Defendant argues that the prosecutor made improper statements or elicited improper testimony several times throughout the trial. He points to the following as instances of prosecutorial misconduct. In her closing argument, the prosecutor stated that the jury was "entitled to hear from all of the participants in this scheme." The prosecutor commented in her opening statement how Noce immediately cooperated with the investigation while Gates initially lied; she further commented that this is why she would recommend a lower sentence for Noce than for Gates. In her direct examination of Gates, the prosecutor elicited testimony concerning her recommended sentence. And she did the same during Noce's direct examination. In her closing argument, the prosecutor remarked upon the terms of Noce's and Gates's plea agreements. In her opening statement, direct examinations of Noce and Insana, and closing argument, the prosecutor also commented on the witnesses' prior consistent statements made to law enforcement. In her closing argument the prosecutor, referring to Insana, said, "He's just that kind of guy." Also in her closing, the prosecutor, in response to a hypothetical about a corrupt business man, said "I think he would" take a bribe. And, finally, the prosecutor elicited testimony that Defendant's wife, Sharon McLain, was in a position to destroy potentially incriminating job cards, and she elicited testimony that McLain

---

[1]Defendant's notice of appeal indicates that he appeals from the district court's ruling on this motion. Because he does not assert this argument in his briefs, we will not consider it.

had not been in the courtroom during the trial.  Defendant did not object to any of these comments or testimony.

## II. ANALYSIS

### A.     Standard of Review

Because Defendant failed to present the prosecutorial misconduct issue below, we review for plain error only.  *See United States v. Vonner*, 516 F.3d 382, 385-86 (6th Cir. 2008) (en banc); *see also United States v. Bostic*, 371 F.3d 865, 871 (6th Cir. 2004).  Plain error is "(1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *Vonner*, 516 F.3d at 386 (citation and internal quotation marks omitted).

### B.     Prosecutorial Misconduct

Reviewing allegations of prosecutorial misconduct is a two-step inquiry: determining whether the statements were improper; and, if so, determining whether they were flagrant[2] enough to warrant reversal.  The flagrancy prong is determined on consideration of four factors: "(1) whether the prosecutor's remarks or conduct tended to mislead the jury or prejudice the accused; (2) whether the remarks were isolated or extensive; (3) whether the remarks were accidentally or deliberately made; and (4) the overall strength of the evidence against the accused." *United States v. Gonzalez*, 512 F.3d 285, 292 (6th Cir. 2008) (citing *United States v. Francis*, 170 F.3d 546, 549 (6th Cir. 1999)).  Moreover, we have held that the prosecuting attorney's remarks must be considered within the context of the trial as a whole when determining whether they are improper.  *Girts v. Yanai*, 501 F.3d 743, 759 (6th Cir. 2007).  Inappropriate but isolated prosecutorial comments do not warrant a new trial.  *United States v. Bond*,

---

[2]Under certain circumstances reversal may be warranted even in the absence of flagrancy. Improper remarks which are not flagrant may provide the basis for reversal only if proof of guilt was not overwhelming, the defendant objected, and the court failed to cure the error with an admonishment to the jury. *United States v. Bess*, 593 F.2d 749, 757 (6th Cir. 1979).  Because Defendant failed to object, this rule is inapplicable here.

22 F.3d 662, 667 (6th Cir. 1994).  The prosecutorial misconduct must have been "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial."  *Id.* (quoting *United States v. Payne*, 2 F.3d 706, 712 (6th Cir. 1993)).  Under plain error review, relief may be granted only if the prosecutorial misconduct was "exceptionally flagrant."  *Girts*, 501 F.3d at 759.

1.     *Alleged Comment on Defendant's Failure to Testify*

Defendant's first allegation of prosecutorial misconduct is that the prosecutor improperly commented on Defendant's decision not to testify.  It is a familiar and well established rule of law that a prosecutor's direct reference to a defendant's decision not to testify at trial is a violation of that defendant's Fifth Amendment privilege against compelled self-incrimination.  *Griffin v. California*, 380 U.S. 609, 610-15 (1965); *Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988).

Defendant argues that one comment in the prosecutor's closing argument, that the jury was "entitled to hear from all of the participants in this scheme," was a direct reference to Defendant's failure to testify.  We reject this argument, even if we consider the comment out of context from the rest of the prosecutor's closing argument.  The comment did not specifically state that Defendant did not testify or that he had not provided an alternative explanation.  *See, e.g.*, *Griffin*, 380 U.S. at 611 ("These things [the defendant] has not seen fit to take the stand and deny or explain. . . . Essie Mae is dead, she can't tell you her side of the story.  The defendant won't.").  Suggesting that the jury was "entitled to hear from all of the participants" was not a direct reference to Defendant or his decision not to testify.

The prosecutor's argument, viewed in context, is not properly interpreted as even an indirect comment on Defendant's silence.  In evaluating a claim of improper indirect comments on a defendant's silence, the court should consider:

> (1) whether the comments were manifestly intended to reflect on the accused's silence or are of such a character that the jury would "naturally and necessarily" construe them as such; (2) whether the comments were isolated or extensive; (3) whether there was otherwise overwhelming

evidence of guilt; and (4) whether appropriate curative instructions were given.

*Gonzalez*, 512 F.3d at 292-93.  Defendant's assertion that the prosecutor indirectly referred to his silence founders on the first prong.  Reversal based on a prosecutor's improper indirect comment on a defendant's silence requires one of two findings: manifest intent to comment on the failure to testify; or the remark was "of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."  *United States v. Robinson*,  651 F.2d 1188, 1197 (6th Cir. 1981) (quoting *United States v. Rochan*, 563 F.2d 1246, 1249 (5th Cir. 1977)).  "We cannot find that the prosecutor manifestly intended to comment on the defendant's failure to testify if some other explanation for his remark is equally plausible."  *Id.* (quotation marks and citation omitted).   Determining whether the jury would "necessarily construe[]" a comment as one on "a defendant's failure to testify requires a probing analysis of the context of the comment, and the likely effect of the district court's curative instruction, if any."  *Id.*

An examination of the prosecutor's comment in context of the trial and the rest of her closing argument is necessary to determine whether there is an explanation for it that is equally plausible with Defendant's assertion that it was a reference to his silence.

> You might wonder why we enter into plea agreements with the likes of Mr. Gates and Mr. Noce.  There is no doubt that these are not the type of people that you would probably want to do business with.  But it is our obligation to take the evidence where it leads us, both through the testimony of witnesses and the documents, such as bank records and letters.  That's the only way we can identify all participants in a scheme.  It's not pleasant to make a recommendation to reduce the sentence of a corrupt public official, such as Jimmy Gates, but sometimes we have to do it to make sure that everyone is brought to justice.

> Good solid citizens who would never dream of paying bribes or taking bribes generally don't have much evidence to give in a trial like this.  And that's because the schemes are secret.  They are carried out in secret and the participants do not disclose to law abiding people the details of their scheme because they might get turned in.

Keep in mind also that the government does not pick these witnesses. The defendant picked these witnesses. The defendant picked these witnesses. He picked Larry Insana as a witness against him when he said to Larry Insana "bring your checkbook to the gas station." He picked Liberator Noce as a witness against him when he said "how about an hour for you and an hour for me." And he picked Mr. Gates as a witness against him when he said to Mr. Gates "let's split the bribes."

You are entitled to hear from all of the participants in this scheme. And your good common sense will determine who is telling the truth in this matter. The Judge will instruct you that you can believe all of what a witness says, some of what a witness says, or none of what a witness says. And you have all been in situations, I'm sure, where you have determined that, whether out of fear or out of stupidity, somebody has initially lied about something. And that as time goes on and they're more emotionally capable of telling the truth, the truth eventually comes out.

The testimony of Defendant's coconspirators was an important part of the case against Defendant. Here the government faced a problem that is as old as conspiracy prosecutions (if not older): its chief witnesses were admitted criminals, coconspirators who had bargained for favorable treatment. The question of the credibility of any such witnesses is a hardy perennial and an obvious target for a defendant. Here, the target was attacked almost immediately in Defendant's opening statement: "Nobody, the evidence will show, . . . will come into this courtroom and indicate that they observed [Defendant] accepting cash improperly, or have firsthand knowledge of him doing so . . . except for those who cannot avoid their criminal responsibility for being involved in such schemes." Defense counsel then pointed out that the evidence would show that Noce and Gates were biased and that they each had an incentive to lie about Defendant to receive a favorable plea bargain. On cross examination, defense counsel went after Gates's credibility based on his character for truthfulness: "And you are telling this jury despite a history of lies to law enforcement about your stealing from your job, that they can trust your word?" Defense counsel also attacked Gates based on his motive from the plea bargain: "And you have to satisfy the government with your testimony in order to get the benefits under that agreement, don't you?" In particular, defense counsel highlighted how Gates had changed his story throughout the investigation.

The prosecutor's comment about the jury being "entitled to hear from all of the participants in this scheme" was simply not a comment on Defendant's silence. Rather, it was an explanation of why the prosecution depended on Gates, whose credibility was so vigorously challenged by defense counsel.

The quoted passage begins by explaining that, although the government does not enjoy dealing with witnesses such as Gates, they have no choice but to "go where the evidence leads" and that honest, law abiding citizens are unlikely to have information about a secretive criminal conspiracy. It is the coconspirators themselves who were "chosen" by Defendant, and who have the relevant information the jury should "hear." An argument that the cooperating witnesses were criminals, not choirboys, is familiar and ageless. The following comment about the jury being "entitled to hear from all of the participants" is nothing other than an explanation for calling a witness of vulnerable credibility. The three paragraphs that immediately follow the comment bolster this interpretation, because they directly address Gates's credibility. Accordingly, this is an "equally plausible" explanation for the prosecutor's comment—indeed, it seems to us the more probable by a wide margin. We cannot, in any event, find that a jury would "necessarily construe" the remark to be a comment on Defendant's silence.

But even if Defendant could make it past the first prong, the other prongs do not weigh in his favor. The remark is the only one that Defendant claims is a comment on his silence. The evidence against Defendant, consisting largely of testimony of coconspirators and bank records, was substantial. Finally, the remark was not so manifestly improper as to require a cautionary instruction *sua sponte*. Additionally, an interruption and a *sua sponte* cautionary instruction could have brought unwanted attention to Defendant's decision not to testify, needlessly doing more harm than good. *See United States v. Robinson*, 357 F. App'x 677, 683 (6th Cir. 2009).

*2.      Improper Vouching*

Defendant also asserts that the prosecutor improperly vouched for the credibility of two witnesses, Noce and Insana.  A prosecutor improperly vouches for a witness "by indicating a personal belief in the witness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness."  *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999).  Improper vouching may consist of "blunt comments" of the prosecutor's personal belief as to the credibility of a witness, or it may consist of comments which imply "that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony."  *Id.*

Here, Defendant asserts that the prosecutor improperly vouched for Noce's credibility when she discussed Noce's and Gates's plea agreements.  We have, on numerous occasions, held that a prosecutor's reference to the plea agreement of a testifying witness may be proper.  *Id.* ("We have allowed a prosecutor to refer to the plea agreement of a testifying witness.").  The prosecutor may "elicit testimony about [the plea agreement's] terms, attack the credibility of the witness because of it and even refer to the plea agreement of a government witness in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility."  *Id.*  In *Francis*, we reasoned that "[t]he potential for impropriety emerges . . . when a prosecutor explains that there is to be a recommendation to the witness's sentencing court whether the terms of the plea agreement have been adhered to."  *Id.*  We held that it was improper vouching when "[the prosecutor] asserted that '. . . if [the witness] testifies in this court truthfully, it's my intent to, as a government's representative, to recommend a 15 year sentence for him.'"  *Id.*  This statement, and others, "made it clear that [the prosecutor's] recommendation would depend on whether she personally believed [that the witnesses] told the truth."  *Id.* at 551.  The *Francis* court also stressed that there was testimony that the witness was only offered a plea bargain after the prosecutor believed that he was telling the truth, which "indicated a belief in the witness's credibility."  *Id.*

Two recent, unpublished cases illustrate the operation of this rule.  In *United States v. Presley*, we found that the prosecutor's comments on a witness's plea

agreement were not improper. 349 F. App'x 22, 27 (6th Cir. 2009). In *Presley*, the prosecutor elicited testimony from two witnesses that their plea agreements required them to testify truthfully: "Q: And what is that agreement? A: To tell the truth." *Id.* at 25. The prosecutor also commented on the plea agreement in his closing argument: "as a result of his cooperation he was actually sentenced to fifty-four months"; and "[h]is arrangement was that he would not be prosecuted if he told the truth." *Id.* The panel found that the evidence was not improper because it simply established the existence of a plea agreement and its two principal terms: a lesser sentence in return for a promise to tell the truth. *Id.* at 26. Accordingly, the prosecutor never stated that he would be the one recommending whether the witnesses told the truth, so there was no implication that the prosecutor would be able to tell if the witnesses were lying. *Id.* In *Presley*, "unlike *Francis*, the prosecutor elicited testimony about the terms of [the witnesses'] plea agreements, but he never told the jury that he would make a recommendation as to whether they had adhered to those terms. There was also no indication that the plea agreements materialized only after the prosecutor believed [the witnesses]." *Id.* Accordingly, the comments were not improper.

We arrived at a different conclusion in *United States v. Mongham*, where we found that the prosecutor's redirect examination question "weren't you told specifically that if you failed to testify truthfully I'd prosecute you for perjury" was improper. 356 F. App'x 831, 836 (6th Cir. 2009). We so held because "by stating the question in the first person . . . the prosecutor implied that he had independent knowledge of whether [the witness's] testimony was truthful." *Id.* In other words, a prosecutor may properly point out that a witness's consideration for a plea bargain is telling the truth, but he may not state (or even strongly imply) that it is he who shall be the arbiter of truth, especially when he has already marked the testimony with his stamp of approval.

Defendant argues that the prosecutor improperly vouched for the truthfulness of Noce's testimony in her opening statement, during Gates's and Noce's direct examination, and in her closing argument. In her opening argument, the prosecutor highlighted that Gates and Noce "reacted differently" to the FBI's investigation:

So in the course of investigating Norman Gore for bribery, the agents came upon the name of Liberator Noce. . . . [T]hey went out to interview Mr. Noce. And Mr. Noce sat down with them, agreed to talk to them, and started telling the story of his life with the City of Cleveland Water Division. He indicated that since the early '90s in one form or another he had been bribing Norman Gore . . . . And he said I also paid two other people in the chain of signing off on these invoices, one is the defendant, Oscar Wells, and the other was Jimmy Gates.

So he took responsibility for his criminal conduct. And when this indictment was returned he pled guilty to three counts of this indictment . . . . And he signed a plea agreement with the government. This is a procedure that is authorized by the Federal Rules of Criminal Procedure when a defendant wishes to cooperate and acknowledge his responsibility for his crimes. You will hear that under the terms of this plea agreement that I will recommend a more lenient sentence for him than he would have gotten if he had not pleaded guilty. It is a recommendation, and the final decision will be up to Judge [Oliver] when [he] sentences Mr. Noce next week. You will learn that—Mr. Noce will testify about his plea agreement and his understanding of it and you will hear that he expects to go to prison for this bribery scheme.

. . .

Mr. Gates reacted differently than Mr. Noce did, to his everlasting regret I'm sure. He decided initially to lie to the agents and to minimizes [sic] the scheme. He had to admit ultimately that he had gotten the checks, although, initially he indicated he only got one. And he made up some story about how his brother was going to do security work for Mr. Noce. He made up a story about it being a loan that he paid back. And he continued over the course of several interviews actually to minimizes [sic] his involvement in the scheme.

He also tried to obstruct the investigation. . . .

. . .

Finally, in the fall of 2006 Mr. Gates, and he'll explain his thought process to you, had an experience that caused him to place a call to Special Agent Massie and said I need to come clean. So the agents went out and talked to him and he described all the details of the bribery scheme, which he will describe to you on the witness stand. He has also pleaded guilty to three counts of this indictment. But I will not be recommending the same sentence for him as I will be recommending for Mr. Noce.

I will ask Judge Oliver to take into consideration the fact that he did give false statements to the agents and he has to take responsibility

for that, and also that he tried to obstruct the investigation by sending out those letters warning his accomplices about the interview that Special Agent Massie and his colleagues had conducted. So I think he will tell you when he testifies that he expects to serve a longer prison sentence than Mr. Noce does.

The clear implication of this opening is that Noce told the truth from the beginning of the investigation, whereas Gates only later began telling the truth. Indeed, Noce's and Gates's testimony directly supports this basic story. It is not improper for a prosecutor, in an opening statement, to preview for the jury an expectation that the evidence will show that one witness initially lied and then told the truth, while another witness told the truth from the beginning. The only potential problem here is the prosecutor's statement that this is why *she* "will be recommending" a reduced sentence for Noce but not for Gates. While the prosecutor did not explicitly state that the recommendation was in consideration for telling the truth (rather, she couched it in terms of being in consideration for pleading guilty), one implication can be that the prosecutor will recommend *personally* a reduced sentence for Noce because *she* believes that he told the truth from the beginning, but she will not make such a recommendation for Gates because *she* does not believe that he told the truth in the beginning. As in *Francis* and *Mongham*, the prosecutor here appears to have implied, if not "made it clear," that her recommendation would depend on whether "she *personally* believed [the witnesses] told the truth." *Francis*, 170 F.3d at 551 (emphasis added). The comments in the opening statement using the first person verged upon improper vouching.

The prosecutor made similar comments during Gates's direct examination: "I have agreed to recommend what's called a departure in your sentence. . . . So your recommendation from me is not as good as it otherwise would have been; is that correct?" And in the direct examination of Noce: "And I agreed to recommend what's called a departure in your sentence because you've agreed to cooperate?" These questions came very close to implying that the prosecutor was making a personal evaluation of whether the witnesses testified truthfully.

Defendant also argues that the following comment from the prosecutor's closing argument was improper:

> Also keep in mind both Mr. Noce and Mr. Gates had an obligation under the plea agreement to tell the truth when they testified. And you heard that Mr. Gates is suffering the consequence of making false statements to the FBI initially about this case. He's expecting two years in prison under the terms of his plea agreement. Mr. Noce is expecting one year in prison.

This remark and line of reasoning were not improper. The prosecutor stated only that the witnesses had an obligation to tell the truth and explained the results of their respective plea agreements. Because the statement is devoid of any indication that it was the prosecutor who *personally* decided what recommendation to make, there is no implication that she is *personally* vouching for the truthfulness of the testimony.

Defendant also argues that the prosecutor improperly vouched for Insana's character for truthfulness, by stating that "when the FBI knocked on his door he told them the truth. He's just that kind of guy." The Government responds that the prosecutor was merely arguing that the evidence showed that Insana was not the type of person who would lie to set someone up. The Government further asserts that this line of argument was in rebuttal to Defendant's theory that Insana and Noce lied about Defendant to protect each other. An examination of the context of the prosecutor's remark demonstrates that the Government is correct:

> Mr. Ivey asked him: "Why didn't you call the police when the defendant solicited a bribe from you? Why didn't you call his supervisor? Why didn't you call his supervisor's supervisor?" Do you remember his answer? His answer was, he paused a minute, and he said "because I didn't want to make w[av]es. I didn't want to hurt anyone."
>
> You heard his testimony. Ask yourselves is he the kind of guy that's out there trying to hurt somebody? He didn't testify the way he did in this courtroom because he wanted to hurt Oscar Wells. And he didn't testify to help Mr. Noce. But when the FBI knocked on his door he told them the truth. He's just that kind of guy.

The remark was proper argument that the evidence suggests that Insana testified truthfully. It was not personal vouching.

Defendant is correct to analogize this case to *Francis*. In *Francis*, the prosecutor improperly remarked during the government's opening statement on the prosecutor's sentence recommendations for two witnesses, one of whom did not initially tell the truth. *Francis*, 170 F.3d at 550. And in the direct examination of one of the witnesses, the prosecutor elicited testimony about how the prosecutor "finally believed" the witness and offered a plea bargain. *Id.* at 551. Likewise, here, the prosecutor remarked during her opening statement on her sentence recommendations for two witnesses, one of whom did not initially tell the truth. And here, as in *Francis*, she elicited testimony concerning the recommendations during the direct examinations of witnesses. But the comparison with *Francis* does not end with the indicators of improper vouching: in *Francis*, reviewing "each comment or set of comments individually for potential flagrancy," *Francis*, 170 F.3d at 546, we held that the prosecutor's comments were not flagrant. The same is true here. Assuming that the comments in this case crossed the line of propriety, "the instances of impropriety . . . were[,] for the most part, isolated from the other sets of remarks and not deliberate. Accordingly, they were not flagrant." *Id.* at 552. We also note the overall strength of the case against Defendant, which included bank records and testimony that Wells made four cash deposits on days that Gates cashed checks from Noce.

### 3.     *Prior Consistent Statements*

Defendant also argues that it was improper for the Government to mention, during its opening statement and on direct examination, Noce's and Insana's prior consistent statements to the FBI. He argues that prior consistent statements are allowed only "to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." *See* Fed. R. Evid. 801(d)(1)(B). Because Defendant had not yet challenged the testimony on cross when the prosecutor mentioned the statements in her opening statement and when evidence of the statements was introduced on direct examination, Defendant argues that it was improper to mention them. This proposition

is well supported.  *See, e.g.*, *United States v. Bolick*, 917 F.2d 135, 140 (4th Cir. 1990); *United States v. Hernandez*, 779 F.2d 456, 459 (8th Cir. 1985); *United States v. Smith*, 746 F.2d 1183, 1185 (6th Cir. 1984); *United States v. Simmons*, 567 F.2d 314, 321 (7th Cir. 1977); *United States v. Stone*, 472 F.2d 909, 914 (5th Cir. 1973).  The plain meaning of Rule 801(d)(1)(B) also supports Defendant's argument, as it allows prior consistent statements only to "rebut" a charge of improper motive and influence, and recent fabrication.

The prosecutor's remarks in her opening statement concerning the consistent pretrial statements made by Noce and Insana were risky if not improper.  Although it was reasonable to expect that Defendant would challenge the credibility of the witnesses based on their motive to secure a favorable plea bargain, the admissibility of the prior statements still hinged on whether such an attack was actually made.  It is conceivable, for example, that a defendant would refrain from making this type of credibility attack for the very purpose of preventing the admissibility of a prior consistent statement.  It is undoubtedly tempting, but generally unwise, for a prosecutor to try to predict the strategy opposing counsel will adopt, and then to try to blunt the strategy's impact.  By prematurely calling attention to prior consistent statements in the opening statement, a prosecutor creates the chance of mistrial and an issue for appeal.

It was not, however, improper for the prosecutor to call attention to the pretrial statements during the direct examination of Noce and Insana.  By this point in trial, Defendant had already charged the witnesses with an improper motive at least three times:  (1) "Both [Noce and Gates] agree[d] to testify against Mr. Wells.  And neither one of them—they've also agreed, the government, that certain other charges that could potentially be brought against them for their conduct, their illegal conduct, in the Water Department will not be brought against them.  And that is their motivation."; (2) "Mr. Insana is a former, and to a certain extent, current business partner of Mr. Noce.  They had a company together doing this type of work.  And this allegation against Mr. Wells helps Mr. Noce.  Other witnesses will be individuals who are trying to help Mr. Noce in his efforts to lessen his consequence in this case."; (3) "There will be no unbiased

witness coming into this courtroom saying that Mr. Wells—they know that Mr. Wells received a bribe." Because the testimony elicited during direct examination of Noce and Insana came after Defendant charged them with an improper motive in his opening statement, the line of questioning was fairly responsive and not improper. *See United States v. Boyland*, No. 91-6069*, 1992 WL 332002, at \*3 (6th Cir. Nov. 12, 1992).

So, even though the prosecutor's remarks about prior consistent statements during her opening statement were arguably improper, there can be no reversible error because the remarks did not prejudice Defendant. Two cited cases in which courts have found that prematurely mentioning prior consistent statements supported remanding for a new trial are distinguishable from this case. In *Smith*, this circuit found that introducing a tape recording of a witness before the witness took the stand prejudiced the defendant, even though the witness later testified that "he agreed to plead guilty and testify . . . because the plea bargain the government offered was just too good to turn down." *Smith*, 746 F.2d at 1185. The recording of the witness in *Smith* was made without his knowledge, before he realized he was being investigated. Accordingly, the recording was acutely corroborative of his testimony. In *Bolick*, the Fourth Circuit found prejudice and reversible error when an officer testified about prior consistent statements made by cooperating witnesses before the witnesses took the stand. *Bolick*, 917 F.2d at 140. The Fourth Circuit found prejudice, in part, because the declarations came from a law enforcement officer lending the "appearance of credibility" to the declarations. Furthermore, the defendant in *Bolick* objected to the officer's testimony, so the standard of review in *Bolick* was less deferential than it is here. None of the considerations in *Smith* and *Bolick* are present here. Unlike the prior consistent statements in *Smith*, the ones here were made after the witnesses knew they were being investigated and the statements were made to FBI agents. So their corroborative value is significantly diminished in comparison to those in *Smith*, because the declarants here already had some motive to cooperate with the government when the statements were made. And unlike in *Bolick*, the remarks here were not made by an especially credible witness. Indeed they were not made by a witness at all and were not evidence. Here,

also unlike *Bolick*, Defendant forfeited his argument by failing to object to the opening statement, so we review only for plain error.

Any potential prejudice that might otherwise have been inflicted upon Defendant by the remarks about prior consistent statements vanished during Defendant's opening statement. Defendant offers no suggestion that he would have refrained from charging the witnesses with improper motive to avoid the introduction of the prior consistent statements. Any such suggestion, if made, would be implausible since a major part of Defendant's defense was an attack on the credibility of the government witnesses. The prosecutor's remarks did nothing more than predict what would soon come out properly in the course of witness examination. Furthermore, there was considerable evidence of Defendants guilt, viz. the bank records and testimony that Defendant made four cash deposits on days that Gates cashed checks from Noce. Under these circumstances, we do not view the prosecutor's remarks concerning the prior consistent statements as flagrant.

4.      *Prosecutor's Comment that "I Think He Would" Take a Bribe*

Defendant also asserts that the prosecutor made an improper comment when she, in response to her own rhetorical question whether a corrupt businessman would take a bribe, said that "I think he would." Defendant argues that this was an accusation that Defendant would be willing to take a bribe. The context of the prosecutor's comment, however, supports the Government's position that the prosecutor was referring to a *hypothetical* corrupt business person. Just prior to making the statement the prosecutor asked: "[W]ould you . . . if you were a corrupt business person, say, I'm in, this is going to work, he'll do it, he'll take a bribe? I think he would." Even though the prosecutor was not referring to the Defendant, she should still have avoided injecting what appears to be personal views or opinion. The prosecutor, perhaps realizing this, immediately amended the thought by adding, "[b]ut what I think doesn't matter. The question is your assessment of the evidence . . . ." Moreover, the court immediately issued a curative instruction: "[The prosecutor] is correct . . . . It's not what you think, but—I mean it's not what she thinks . . . but what the evidence shows . . . ." There was therefore little

chance that the statement would mislead the jury or prejudice Defendant. And the prosecutor's immediate correction demonstrates that it was almost certainly inadvertent rather than deliberate. Defendant points to no other incidents where the prosecutor made similar statements expressing personal opinions on what the evidence meant. It was isolated. And again, the strength of the other evidence against Defendant indicates that the comment was not flagrant.

5.     *Comments Regarding Defendant's Wife*

Defendant argues, quite briefly, that it was improper for the prosecutor to present testimony that Defendant's wife was in a position to destroy work cards and that she had not been present in the courtroom during the trial. We see nothing improper about the testimony concerning possible destruction or removal of work cards. The Government agent was not able to locate work cards from a certain critical time period. Gates testified that Sharon McLain, an employee in the Water Department before and after her marriage to Wells, had access to the work cards as did Defendant himself. Allowing for a common sense inference that a wife might be willing to protect her husband by hiding or destroying evidence, the testimony bears on what may have happened to potential evidence that could not be located after extensive searching.

Defendant argues also that a comment about his wife's absence from the courtroom was an attempt to improperly shift the burden to him by pointing out that she did not testify. The questioning came in the following context:

> Q. And in the exhibit that you are describing, Government's Exhibit 12, involving the four Noce checks to Mr. Gates, were the quality of those copies the best you could do given the format they were given to you in?
>
> A. Yes.
>
> Q. So sometimes some of the entries are a little fuzzy and difficult to read?
>
> A. That's correct.
>
> *Q. Are you familiar with Sharon McLain? Have you ever met her?*
>
> *A. Yes, I have.*

> *Q. She's now the defendant's wife?*
>
> *A. She is.*
>
> *Q. Has she been in the courtroom during these proceedings at all?*
>
> *A. No, she has not.*
>
> Q. Now, turning to what's been marked as Government's Exhibit 10. Is this a multi page exhibit?
>
> A. It is.

(Emphasis added.)

These questions, the point of which is not entirely clear, came in the middle of a series of questions to Special Agent Massie about Exhibits 12 and 10, summaries of subpoenaed records of Defendant's banking activity and the operation of a sports gambling pool. Significantly, it came before Defendant had the opportunity to present any evidence, so it is highly improbable that the jury would consider it a comment about a "failure to produce" anyone as a witness. We note also that one or more documents earlier admitted in the case bore a reference to Defendant's wife: a previous witness, for example, had recognized McLain's initials—notably accompanied by a "smiley face"—on a document faxed from the Water Department concerning a job order. We are tempted to think that there may have been some reference to McClain in the documents being displayed to the witness that prompted questions about her that appear to have come in from left field. Considering the record as presented, we do not know, and will not further speculate. But even if we considered the question improper, the uncertainty of its import, its momentariness, and its utter isolation suggest that it did not mislead the jury or cause identifiable prejudice. In any case, the comment was not flagrant.

## C.     Ineffective Assistance of Counsel

Finally, Defendant argues that we should review his ineffective assistance of counsel claims on this direct appeal. He asserts that trial counsel was ineffective for failing to object to alleged instances of prosecutorial misconduct and failing to prepare

for and to impeach Noce's testimony.  Ineffective assistance of counsel claims alleging that trial counsel's performance was prejudicially deficient, *Strickland v. Washington*, 466 U.S. 668, 687 (1984), are generally not reviewed on direct appeal "except in rare cases where the error is apparent from the existing record." *United States v. Lopez-Medina*, 461 F.3d 724, 737 (6th Cir. 2006) (internal citations omitted). "Ineffective assistance claims are more properly raised in a post-conviction proceeding brought pursuant to 28 U.S.C. § 2255, where the record regarding counsel's performance can be developed in more detail." *Id.*

All Defendant's claims implicate matters of trial preparation and strategy—preparation for and impeachment of witnesses, and whether objections should be raised.  The record does not reveal why defense counsel decided not to raise particular objections or employ particular impeachment techniques.[3]  Defendant has not adequately explained why his ineffective assistance claims should be reviewed on appeal rather than through a habeas petition.  Because the record is not sufficiently developed, we decline to address Defendant's ineffective assistance of counsel claims.  The motion to "take judicial notice" is moot.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of conviction, and we **DENY** Defendant's Motion to Take Judicial Notice, filed on August 27, 2009, as **MOOT.**

---

[3]This is true even assuming that Defendant's motion to take judicial notice would be granted. Regardless of whether we would consider the FBI reports, the record remains insufficient to evaluate whether defense counsel's conduct was sound trial strategy within the realm of reasonable professional assistance.