**NOT RECOMMENDED FOR PUBLICATION**
File Name:  15a0629n.06

**No. 14-6051**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED**<br>Sep 09, 2015<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON   APPEAL   FROM   THE |
| | ) | UNITED   STATES   DISTRICT |
| SHAWN WASHINGTON, | ) | COURT   FOR   THE   WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE:  BATCHELDER, GIBBONS, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**  Shawn Washington challenges on insufficiency grounds his drug conspiracy and firearm convictions and asserts that prosecutorial misconduct during rebuttal closing argument violated his due process rights.  We affirm.

**I.**

A superseding indictment charged Washington and two co-defendants, Tario Johnson (aka Tario Jordan) and Georglvekio Hampton, with conspiring to possess with intent to distribute at least 500 grams of cocaine, 21 U.S.C. § 846; aiding and abetting the possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c) and 18 U.S.C. § 2, and aiding and abetting the carrying of a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c).  PID 166-69.  The superseding indictment also charged Washington with a fourth count, felon in possession of a firearm, 18 U.S.C. § 922(g)(1).

Co-defendants Johnson and Hampton pleaded guilty to the drug conspiracy charge; Washington proceeded to trial and the jury convicted him on all four counts. PID 224, 344, 414, 444; 166-69. The district court imposed an aggregate sentence of 300 months' imprisonment. PID 446. Washington timely appealed. PID 450.

## A. Trial Testimony

Former co-defendant Tario Johnson testified that he and Washington lived in the same neighborhood and have known each other since childhood. Johnson and Hampton are cousins. PID 633-34. Johnson testified that he met Montrell Partee while both were serving time in the Shelby County Jail, and that he contacted Partee in May 2013 to purchase kilos of cocaine. PID 636, 693. Partee told Johnson that he had a cousin coming to town with kilos for sale. PID 637.

Special Agent Michael Ciesliga testified that Partee, a confidential informant (CI), called him after hearing from Johnson. Ciesliga and Partee met to discuss setting up a reverse buy and Partee placed phone calls to Johnson to arrange the reverse buy, which Ciesliga monitored and recorded. PID 856-57, 859, 584. Ciesliga, who led the investigation, testified that he was aware that CI Partee had a criminal record and was on probation. PID 858.[1]

Bartlett Police Department Undercover Officer Terry Brewer testified that his role in this operation was to sell cocaine to Johnson. PID 524. Brewer had worked as an undercover agent with the Task Force and with CI Partee once before and found Partee credible. PID 522-23.

Brewer testified that in the early afternoon of May 29, 2013, he and CI Partee met Johnson at the food court of the Wolfchase Galleria Mall in Cordova, Tennessee. PID 525, 527,

---

[1] Ciesliga testified that after listening to the phone calls, Tario Johnson and his brother, Christopher Jordan, (not Washington) were targets of the investigation. PID 862.

638. Brewer testified that he had told Johnson in advance of this meeting not to bring any weapons or money and that Brewer would have no drugs with him. PID 528. When they finished eating, the three men walked out of the mall to a vehicle that Brewer had waiting in the parking lot. PID 527, 639. The vehicle had been wired for sound in preparation for this meeting. PID 863.

Brewer testified that he patted Johnson down[2] and that he and Johnson entered the vehicle while CI Partee waited outside. PID 528. Brewer and Johnson then negotiated the price of the cocaine and, at one point, Johnson called someone and put that person on speakerphone. PID 530. Johnson testified that although he told Brewer that the person on the phone was his brother, in fact, the person on the phone was "Big," whose real name he did not know. PID 640. Johnson denied talking to his brother. PID 695-98.

Brewer and Johnson agreed that Brewer would sell Johnson three kilograms of cocaine at $29,000 per kilogram, PID 530; 589-90, and Brewer showed Johnson one of the kilos of cocaine. PID 531, 587, 612. Johnson exited the vehicle and walked back towards the mall. PID 534. Partee and Brewer went to meet with Agent Ciesliga at a different location. PID 863. Other agents saw Johnson re-enter, walk through, and exit the mall, but did not follow him in order to avoid alerting him to the operation. PID 589, 863. Brewer testified that Johnson called him shortly after and said "We're gathering the money together," and that he wanted to meet later that evening. PID 534.

---

[2] On cross-examination, Brewer testified that he did not have a weapon on his person but had one in the vehicle. PID 563. Agent Lytal testified as to the importance of Johnson's knowledge of the absence of drugs, money, and weapons at the initial meeting. PID 585-87.

Between 3:00 and 4:00 that afternoon, Brewer and CI Partee met with other Task Force officers, including Agent Ciesliga, at the Microtel Inn, reserved two hotel rooms, set up surveillance in parking lots surrounding the Microtel, and arranged to meet Johnson there for the cocaine/money exchange. PID 534, 866.

Before the exchange occurred, Johnson called Brewer and reached a new agreement; to buy two rather than three kilograms of cocaine. PID 536. Johnson testified that "Big" thought Johnson was dealing with the police and no longer wanted to fund the deal. PID 642-43. Johnson therefore concocted a scheme to create a "money bag," piles of paper with one real bill on top of each pile, to trick Brewer and Partee into giving him the cocaine. Johnson drove to "the neighborhood," saw Hampton on the street and Washington across the street, and recruited them to "play [Brewer] out of" the kilos of cocaine. The arrangement was that Johnson would keep one kilo for himself, while Hampton and Washington would split the second kilo. PID 644-48.

When Johnson told Hampton and Washington that Brewer was carrying a firearm, Hampton and Washington said they had to have guns as well. The three men drove to the home of Javier Jones, who loaned Washington a gun. PID 645-48. Johnson testified that Washington concealed the gun borrowed from Jones in his waistband. PID 649. The three next went to the home of "Little Mike," who provided a gun for Hampton. PID 649-50. Next the three went to the home of "Nuck," who helped them create the money bag. PID 650. Johnson testified that he, Hampton, and Washington were involved in cutting the newspaper to the size of U.S. currency and making the fake money bag. PID 651. While they were cutting the newspaper, Terrence Norton, who knew Johnson, pulled up and asked what they were doing. Johnson told

him their plan, and asked if he had any hundred dollar bills on him. Norton provided one. PID 652.

Around 7:00 or 7:30 p.m. that evening, May 29, 2013, Johnson arrived at the Microtel parking lot driving a Nissan Maxima. Agents Brewer and Ciesliga, who were in second-floor Microtel rooms, testified that they saw another person in the front passenger seat, but did not see anyone in the back seat of Johnson's vehicle. PID 537-40, 869. Agent Lytal testified that he could not see anyone in the vehicle, and only knew people were inside because the vehicle was moving. PID 615.

A second Nissan Maxima followed Johnson into the parking lot. Both Agents Brewer and Ciesliga saw two people in the second vehicle and testified that one appeared to be female. PID 539, 869. Johnson testified that Norton was following in the second car because he had been promised something in exchange for his $100 bill. PID 654.

Brewer testified that the vehicles parked for about ten seconds, then started circling the parking lot, and that he then received a phone call from Johnson saying that they were spooked and leaving. PID 541. Johnson testified that once the two cars parked, he called Partee repeatedly but Partee did not answer. Norton then got nervous and thought he saw police parked in the lot, and the two vehicles left. PID 654-55.

Johnson testified that he drove to a Popeye's Chicken and the three men discussed what to do. At some point, Partee returned Johnson's calls and convinced Johnson to come back to complete the deal. Johnson testified that Norton did not return to the Microtel because he was in his girlfriend's car and had to go pick her up, PID 655-56, and that before returning to the Microtel, Hampton stashed the gun he had borrowed at a gas station, having remarked that the

three of them were convicted felons and there were too many guns to get rid of if anything happened. PID 706.

Around 9:30 that evening, Johnson returned to the Microtel in the Nissan Maxima and called Brewer. PID 542, 591. Brewer could not see how many persons were in the vehicle from the hotel room. PID 545. Brewer instructed Partee to go down to the parking lot and make sure Johnson had the money before they came up to get the cocaine. PID 542. Brewer and Ciesliga, still in the hotel rooms, watched the action in the parking lot and radioed what was happening to Lytal. PID 618-19. Brewer testified that the agents had pre-arranged that Johnson would be taken down in the parking lot before the exchange actually occurred. PID 574.

When Partee got to the parking lot, Johnson grabbed the fake money bag from Washington, showed it to Partee, and passed it back to Washington.[3] Partee then got into the backseat of Johnson's car. PID 657. Partee called Brewer and said that the men had the money but wanted to see the cocaine, at which point Brewer had Partee tell the three men to come up to the hotel room. PID 545, 658. Agent Lytal testified that Ciesliga alerted him that Johnson and the others in the vehicle were about to exit the vehicle. At that point, Lytal ordered the take down. PID 617-18. Johnson testified that as the three men got out of the car, he told Washington to keep the gun hidden in his waistband. PID 659. By the time Agent Lytal and other agents arrived, Johnson was standing by the driver's door, Hampton by the front passenger door, Partee by the rear driver's side door, and Washington by the rear passenger door. PID 592-93.

---

[3] Johnson testified that when he handed the money bag back to Washington, as Partee was getting into the car via the rear driver side door, Washington covered the bag with his hands so that Partee could not see that the money was fake. "Washington knew, like, to cover. He put his hands over it like he – like he covered it up. He knew what to do. He kn[e]w exactly what to do." PID 703.

Johnson testified that Washington grabbed the money bag when he got out of the car. As Johnson began to walk away from the vehicle, he noticed a black truck approaching with its lights off and, thinking it was the police, told Washington to throw the gun. Instead, Washington threw the bag into the Nissan, pulled the gun out as he was getting back in, and closed the door. Hampton also jumped back into the Nissan and locked the doors.[4] PID 659-60.

Agent Lytal testified that as he approached Washington, he noticed Washington was holding a plastic bag. PID 594. Lytal saw Washington run back to the vehicle and throw the bag. PID 594. Washington got back into the car, locked the door, and bent over in the seat, reaching for his belt. Lytal attempted to break the vehicle window with his weapon, screaming at Washington to sit up and show Lytal his hands. PID 595, 735. Lytal also yelled out "Gun, gun" to let the other officers know that Washington had a weapon. PID 595-96. Lytal testified that the plastic bag contained approximately $140 wrapped around bundles of newspaper cut to the size of U.S. currency. PID 601-02.

Special Agent Johnie Carter testified that as Washington was sitting in the rear passenger side of Johnson's Nissan, Carter saw Washington take a gun from under his shirt and move his hand toward the floorboard. PID 736. Agent Lytal testified that when Washington finally sat up, raised his hands, and unlocked the car door, Lytal saw a gun on the floorboard between Washington's feet. PID 597. Carter testified that once Washington raised his hands and began complying with Lytal's commands, Washington began "shuffling his feet, trying to kick the weapon up under the seat in front of him." PID 736. At this point, Lytal took Washington out of the Nissan. PID 597. Carter cuffed Washington and retrieved the gun. PID 736. Carter testified

---

[4] With the attention drawn to Hampton and Washington, Johnson escaped. He was eventually arrested on October 3, 2013. PID 661.

that there were car parts under the front seat that would have prevented the gun from sliding from the front floorboard to the rear. PID 738.

Johnson testified regarding his plea agreement that had he gone to trial, his guidelines range would have been 262 to 327 months, but since he pleaded guilty his guidelines range is 188 to 235 months and the Government agreed to give full consideration to his testimony in determining whether to file a substantial-assistance motion under U.S.S.G. § 5K1.1. PID 688-693. He also identified the gun found at Washington's feet as the gun Javier Jones loaned Washington. PID 649.

## B.

Washington moved for a judgment of acquittal on insufficiency grounds, Fed. R. Crim. P. 29, at the close of the Government's proofs and at the close of all the evidence. Both motions were denied. PID 804, 807; 928, 936-37. The jury found Washington guilty on all four counts of the superseding indictment. PID 1089-90.

## II. Insufficiency Challenges

We review de novo a sufficiency-of-the-evidence challenge in a criminal case. *United States v. Garcia*, 758 F.3d 714, 718 (6th Cir. 2014). Viewing the evidence in the light most favorable to the prosecution, we ask whether any rational trier of fact could have found the contested elements of the crime beyond a reasonable doubt. *Id.* "Circumstantial evidence alone is sufficient to sustain a conviction under this deferential standard of review." *United States v. Fekete*, 535 F.3d 471, 476 (6th Cir. 2008).

## A. Drug Conspiracy

Washington contends that, without former co-defendant Johnson's testimony, there was insufficient evidence for the jury to convict him of participating in a drug conspiracy. He asserts that no rational juror could have found beyond a reasonable doubt that he knowingly agreed with Johnson to possess with intent to distribute cocaine because only Johnson testified as to the conspiracy facts and Johnson's testimony was "wholly unreliable" because it was motivated by desire to "get a lighter sentence and protect his cousin, Hampton." Appellant Br. 27-28, 33.

Problematic for Washington is that "[a]ttacks on witness credibility are simple challenges to the quality of the government's evidence and not the sufficiency of the evidence." *United States v. Gibbs*, 182 F.3d 408, 424 (6th Cir. 1999). When reviewing the denial of a motion for acquittal, this court "can neither independently weigh the evidence, nor make our own assessment of the credibility of the witnesses who testified at trial." *Garcia*, 758 F.3d at 718.

Defense counsel argued to the jury that Johnson was not believable. The jury could, and apparently did, reject this argument and its choice to do so was a rational one. *See United States v. Arnold*, 486 F.3d 177, 182 (6th Cir. 2007) (en banc) (finding sufficient evidence to convict on a felon-in-possession charge, observing that "[a]s in all criminal trials, the jury did not have to draw these inferences. But it reasonably could have reached these conclusions–and when that is the case we must respect the jury's inferences over our own . . . . our mandate is to affirm when the jury's choice was a rational one.").

Another flaw in Washington's argument is that Johnson was not the only witness to testify regarding Washington's participation in the drug conspiracy; other witnesses testified that Washington was riding in the same vehicle as the person who arranged the deal, showed up at

the time and place a two-kilogram cocaine sale was supposed to occur, and had in his possession a loaded firearm and a plastic bag of cut-up newspaper made to look like real money.

Inconsistencies in Johnson's testimony notwithstanding,[5] any rational juror could have found beyond a reasonable doubt the elements of a drug conspiracy, 21 U.S.C. § 846, 1) an agreement to violate drug laws, 2) knowledge and intent to join the conspiracy, and 3) participation in the conspiracy. *United States v. Allen*, 619 F.3d 518, 522 (6th Cir. 2010); *United States v. Welch*, 97 F.3d 142, 146, 148 (6th Cir. 1996).

## B. § 924(c) and § 922(g) firearm convictions

Washington's insufficiency argument as to his firearm convictions is the same as to the drug conspiracy conviction: that only Johnson's testimony establishes that Washington possessed, used and carried a firearm in furtherance of a drug crime. He argues that without Johnson's testimony, all that was established was that his presence at the scene was surplusage and that the crime would have transpired whether he was present or not. Appellant Br. 41-46.

---

[5] Washington points to the following inconsistencies in Johnson's testimony: (1) Johnson stated that in the parking lot of Wolfchase Mall, Johnson was actually talking to someone called "Big," rather than his brother, PID 640, 694-95; (2) Johnson's testimony that he told Washington and Hampton that Brewer was registered to carry a firearm, which contradicts the testimony of Agent Lytal, who testified that all parties knew that no weapons, money, or drugs would be present at the initial meeting at Wolfchase Mall, PID 585, and the testimony of Agent Brewer, who testified that though he patted Johnson down for a gun, Johnson did not request to pat Brewer down, PID 563; (3) Johnson was unable to provide an address for "Little Mike," who lived only a couple of streets away from Johnson and from whom he secured a gun for Hampton; and (4) though Johnson said that Norton did not return to the Microtel with him because Norton needed to pick his girlfriend up, Agent Brewer testified to seeing two individuals in Norton's car, one with long hair and likely a female. PID 656, 539. Washington asserts that the remaining testimony establishes that his name was never mentioned in the initial phone calls and meetings, that he was not present during the negotiations at Wolfchase Mall, and that no one definitively saw him in Johnson's car the first time it arrived at the Microtel.

To establish a violation of 18 U.S.C. § 924(c)(1),[6] the Government must prove that Washington 1) carried or used a firearm, 2) during and in relation to a drug trafficking crime, or that Washington 1) possessed a firearm, 2) in furtherance of a drug trafficking crime. *United States v. Gill*, 685 F.3d 606, 611 (6th Cir. 2012). Washington challenges only the possessed or carried element.

To establish a violation of § 922(g), the Government must prove that Washington had a previous felony conviction, knowingly possessed the firearm specified in the indictment, and that the firearm traveled in or affected interstate commerce. *United States v. Morrison*, 594 F.3d 543, 544 (6th Cir. 2010). Again, Washington challenges only that he possessed the firearm.

Detective Carter, as well as Johnson, testified that Washington had the firearm on his person and the jury properly could believe them. In addition, officers found the firearm on the floorboard of Johnson's vehicle, where Washington was sitting. Under these circumstances, we conclude that the jury acted rationally in deciding that Washington possessed the gun and we affirm Washington's firearm convictions.

**III.**

Washington asserts that the Government violated his due process rights when it impermissibly shifted the burden to him during rebuttal closing argument by indirectly commenting on his failure to testify or produce evidence, and when it belittled defense counsel.

---

[6] 18 U.S.C. § 924(c)(1) provides in pertinent part:

> any person who, during and in relation to any . . . drug trafficking crime . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--
> (i) be sentenced to a term of imprisonment of not less than 5 years . . .

Washington acknowledges that our review is for plain error because no objection was made below. Appellant Br. 47; *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006). Washington must show that the district court erred, and that the error was plain and affected his substantial rights, that is, that it affected the outcome of the proceedings. *United States v. Davis*, 514 F.3d 596, 615 (6th Cir. 2008) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)).

## A.

"It is axiomatic that a defendant in a criminal trial need not testify or produce any evidence, and that a prosecutor may not comment on the absence of such." *United States v. Gonzalez*, 512 F.3d 285, 292 (6th Cir. 2008) (internal citation omitted).

> Reversal based on a prosecutor's improper indirect comment on a defendant's silence requires one of two findings: manifest intent to comment on the failure to testify; or the remark was "of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."

*United States v. Wells*, 623 F.3d 332, 338–39 (6th Cir. 2010) (quoting *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir. 1981)). Yet, "[i]n determining whether the prosecuting attorney's remarks were improper, they must be considered within the context of the trial as a whole, with particular attention to whether they may have been invited by defense counsel's conduct." *Gonzalez*, 512 F.3d at 292.

Washington first challenges the prosecutor's remark in rebuttal closing argument that the defense promised to put on wire calls and recorded calls:

> "I think [the defense] even promised in opening you're going to hear all these wire calls [between Partee and Johnson]. You're going to hear recorded phone calls, all this other stuff. Well, they had them. You heard that. I mean, they had all that. I mean, they could have – they could have accessed this evidence. Okay. They chose to put proof on. It's just meant to confuse you and just question what you heard."

PID 1023. Washington asserts that "[p]articularly, the last statement implied that, because the defense [did not] put any proof on, the defense had an obligation not to remain silent regarding all proof." Appellant Br. 50.

In opening statement, defense counsel had stated:

> I believe that you'll hear or hear about phone calls between Montrell Partee and not Shawn Washington and not Mr. Hampton, the codefendant, only with Tario Johnson. That's it. There will be about 12 of them, and hopefully you'll get to here [sic] them all. I expect you'll hear something. You'll not hear one time, even one time the mention of Shawn Washington, not one time. I believe you're going to hear from Mr. Partee because he's looking down the barrel at a bunch of time because of that violation of probation. The proof's going to show that. He's desperate.

PID 1185-86. Defense counsel argued in closing:

> The first guy that [defense counsel (Washington was represented by two attorneys)] told you about – and, yeah, she made some promises to you. She said you're not going to be able to trust Montrell Partee . . . Yeah, she made some allegations. Yeah, she anticipated that the Government was going to call Mr. Partee. Why? He's the guy who started the whole train rolling.
>
> Did we hear from Mr. Partee? Absolutely not. Maybe [AUSA] French will say, "Hey, the defendant could have called them." I guess we could have. But you know what? We don't have the power that the US Attorney has . . . . We don't have the power to give people motions for substantial assistance.
>
> . . . . So, yeah, we talked a lot about Montrell Partee. We did 'cause we anticipated that he would be called, but he wasn't. So, you know what? I guess we can just kind of forget about Mr. Partee. I guess we do know he set up a drug deal. We know that he apparently, according to the Government's theory, went down inside the car and was there when all this happened. For some reason we don't have that testimony from Mr. Partee.
>
> So, we're really left to guess what the heck he would say. We don't know. It's just guesswork. Everything you heard about Mr. Partee observing is complete pure hearsay. It came from other people. So, he's gone . . . . he wasn't called and you have to ask yourself why.

PID 983. Defense counsel in closing also identified other witnesses the Government did not call, including "Big," "Little Mike," and "Javier Jones," and asked the jury to "think about all the stuff you didn't hear about." PID 1003, 1006.

Given defense counsel's remarks in opening statement that the jury would likely hear phone calls between Partee and Johnson and that Partee would likely testify, and remarks in closing questioning why Partee did not testify, the prosecutor's rebuttal remarks could be seen as responsive to the defense and there was no plain error. *See United States v. Farrow*, 574 F. App'x 723, 728 (6th Cir. 2014) (noting that "when the defense has questioned why the prosecution has not called a particular witness, the prosecution may respond that the defense also could have called that witness to testify," and that the prosecution's statements did not shift the burden to the defendant by making it appear that the defendant was obligated to call witnesses to prove his innocence).

Washington also complains of the prosecutor's attack on "the defense's supposed theory that everyone lied, even the officers," Appellant Br. 50, arguing that defense counsel actually accused only one Government witness, Johnson, of lying. The record belies this claim. For example, defense counsel suggested to the jury that Agent Lytal did not see Washington with a gun, did not truly believe Washington had a gun, and that Lytal's depiction of the takedown did not actually occur. PID 1000-01. Defense counsel also challenged various officers' testimony that they could not be sure whether someone was in the back seat of Johnson's vehicle the first

time it arrived at the Microtel parking lot. PID 984-86. There is thus no merit to Washington's

claim that "the defense never posited the theory that the officers lied." Appellant Br. 52.[7]

Washington also asserts that the following prosecutorial remarks in rebuttal closing were

improper:

> I think it's very telling that, you know, at this point . . . we finally are hearing what the defense is which was, well, everybody's lying. Everybody lied. Decorated officers lied and, really, you know, Mr. Johnson fled and the CS [confidential source/confidential informant] fled before the CS even got in the car and the whole money bag is a lie and the gun's a lie.
>
> Well, why didn't they ask him that on cross? Have you thought about that? Isn't that weird? Isn't that weird that now we hear this after all the officers are gone and can't defend themselves?
>
> It's actually what has happened here in degrading them and calling them liars, 'cause that's what he called them, it's offensive. It's offensive with their years of experience and what they did.

PID 1018.

The remark, "we *finally are hearing what the defense is* which was, well, everybody's

lying," (emphasis added) comes close to indirectly commenting on Washington's silence. But,

when considered in context with the defense's remarks in closing argument, Washington has not

shown that the prosecutor either had a manifest intent to comment on his silence or that the

prosecutor's remarks were "of such a character that the jury would naturally and necessarily take

it to be a comment on the failure of the accused to testify." *Wells*, 623 F.3d at 338–39.

---

[7] Washington also asserts that the defense did in fact cross-examine Johnson, for example, regarding "Little Mike's" address, suggesting that there was no "Little Mike." That is true, but the prosecution did not argue that the defense did not cross-examine Johnson at all. *See* PID 1018.

The prosecutor responded to defense counsel's arguments in closing 1) that many of the officers were lying, and 2) suggesting an alternative version of what actually occurred.[8]

**B.**

Next, Washington asserts that the Government attacked and belittled defense counsel during closing argument, impermissibly calling defense counsel's character and truthfulness into question. Appellant Br. 53.

A prosecutor should not directly or implicitly impugn the integrity or institutional role of defense counsel. *United States v. Jamieson*, 427 F.3d 394, 414 (6th Cir. 2005). Again, we view the prosecution's remarks in context. *Gonzalez*, 512 F.3d at 292.

The prosecutor argued that the jury should not be confused by defense counsel's arguments, characterized defense counsel's arguments as "nonsense" and "smoke and mirrors" designed to obfuscate the Government's evidence, and argued that the defense was attempting to confuse or distort the issues with arguments not supported by the evidence. Similar remarks have been held proper when they are responsive to defense counsel's closing argument. *See e.g.*, *United States v. Bedford*, 567 F.3d 225, 233 (6th Cir. 2009) (prosecution's remarks that some of defendant's arguments were "Mickey Mouse defenses," that some were attempts to confuse the jury, and that defense counsel hoped that the jury would lose sight of the real issues in the case,

---

[8] For example, defense counsel strongly suggested in closing that prosecution witnesses had fabricated much of what transpired in the parking lot of the Microtel Inn:

> If you want to try and figure out what happened, use your common sense. Is it possible that the CI comes down, sees the car, and takes off running before any of this meeting ever happened? . . . . And that Tario Johnson sees the CI run as he's getting out of the vehicle and said, "Uh-oh, this is a setup," and he runs, too. That makes sense. Why? Because when these police officers descend upon the scene, guess who's gone? Tario Johnson's completely disappeared.

PID 997.

"did no more than respond to [defendant's] actual and reasonably likely contentions and tactics."); *Byrd v. Collins*, 209 F.3d 486, 536 (6th Cir. 2000) (prosecutor's suggestion that defense counsel was hiding something from the jury was not improper disparagement where it "was clearly a suggestion of a reasonable inference to be drawn from defense counsel's presentation of evidence and argument.").

Given defense counsel's suggestion in closing argument that prosecution witnesses fabricated that Washington had a gun, the prosecution's remarks regarding the lack of evidence supporting defense counsel's rendition were not improper. *See United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005) (observing that prosecution's comments were "made in response to factual theories presented in the closing argument for the defense, and the prosecutor was entitled to point out the lack of evidence supporting those theories.")

The district court did not plainly err by failing to find sua sponte that the Government shifted the burden or indirectly commented on Washington's failure to testify. Nor did the district court plainly err by failing to find that the prosecutor's remarks directly or implicitly impugned the integrity or institutional role of defense counsel; the prosecutor's remarks were directed at the merit of defense counsel's arguments, not at defense counsel.

We affirm.