FILED
**United States Court of Appeals
Tenth Circuit**

**July 29, 2024**

**Christopher M. Wolpert
Clerk of Court**

PUBLISH

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

FRANCIS F. JOSEPH,

    Defendant - Appellant.

No. 23-1192

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:21-CR-00083-RM-1)**
_____

Elizabeth A. Franklin-Best, Elizabeth Franklin-Best, P.C., Columbia, South Carolina, for Defendant – Appellant.

John J. Liolos, Trial Attorney (Nicole M. Argentieri, Acting Assistant Attorney General; Lisa H. Miller, Deputy Assistant Attorney General, with him on the brief), Fraud Section, Criminal Division, U.S. Department of Justice, Washington, D.C., for Plaintiff – Appellee.

_____

Before **McHUGH**, **MURPHY**, and **CARSON**, Circuit Judges.
_____

**MURPHY**, Circuit Judge.
_____

## I. Introduction

Dr. Francis Joseph was the founder of Springs Medical Associates ("Springs Medical"), a medical practice based in Colorado Springs, Colorado. Following an ill-

fated corporate governance agreement which installed a new Chief Operating Officer ("COO"), Joseph concocted a scheme for the alleged purpose of regaining control of the practice. Between March and June 2020, he submitted several false and unauthorized applications to federal COVID-19 relief programs on Springs Medical's behalf. As a result, Joseph received over $250,000 in federal aid, which he disguised from Springs Medical leadership and ultimately misspent for personal gain.

In 2023, a jury convicted Joseph of two fraud-based counts. On appeal, he argues insufficient evidence existed to demonstrate he possessed the requisite intent to commit the offenses. He also presents several challenges to his trial and sentencing proceedings, including that the district court improperly (a) limited his cross-examination and introduction of evidence; (b) admitted expert testimony as lay testimony; (c) allowed the government to introduce Fed. R. Evid. 404(b)(1) propensity evidence; (d) declined to provide clarifying jury instructions; and (e) miscalculated the economic loss under the sentencing guidelines occasioned by his offenses. This court concludes the record is replete with direct and circumstantial evidence that Joseph intended to commit fraud through his relief program applications. Further, except for the district court's admission of expert testimony in the guise of lay testimony, which was harmless, the district court neither erred in sentencing nor abused its discretion in conducting Joseph's trial. Thus, exercising jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), this court **affirms** the district court's judgment.

2

## II. Background

### a. Federal Relief Programs

Joseph completed unauthorized applications for two federally funded relief programs: the Accelerated and Advance Payment Program ("AAP"); and the Paycheck Protection Program ("PPP"). In light of the strain caused by the COVID-19 pandemic on national healthcare, the Centers for Medicare and Medicaid Services ("CMS") expanded the existing AAP to cover a broader range of Medicare providers. The program supplied funds to providers who experienced disruptions in Medicare claim submissions and processing. As long as applicants met basic criteria, AAP allowed providers to request a loan of up to 100% of Medicare payments for a three-month period. The loans permitted providers to receive full payment for claims until the date of recoupment, which began one year following the issuance of the loan. During this collection period, Medicare automatically offset amounts owed for new claims to repay the advanced funds.

PPP was authorized by the Coronavirus Aid, Relief, and Economic Security ("CARES") Act in March 2020 to help businesses weather the unpredictable economic conditions caused by the pandemic. The loans were facilitated by the Small Business Administration ("SBA") and were forgivable if used for the limited purposes of payroll retention and paying mortgage interest, rent, or utilities. To obtain a PPP loan, a qualifying business had to submit a signed application from an authorized representative of the company. Candidates were further required to certify their acknowledgment of the program rules and provide payroll details. Both PPP and

3

AAP loans were processed by third-party lenders, which coordinated with government entities to ensure applicants were properly approved and received the correct amount of relief.

### b. Factual & Procedural History

Joseph was the founder and managing physician of Springs Medical. He managed and controlled the practice until January 29, 2020, when Springs Medical adopted a document entitled "Joint Action by Written Consent of the Directors and Shareholders of [Springs Medical]" (the "Joint Action Document"). The Joint Action Document appointed Eric Papalini as Springs Medical's COO and bestowed upon him the authority and discretion to "make all actions necessary or desirable related to the operation of [Springs Medical]." As particularly relevant here, Papalini's authority included, "without limitation, the authority to hire and fire employees, manage [Springs Medical's] banking accounts, make all decisions regarding [Springs Medical's] finances, borrow money in the name of [Springs Medical], make any contracts, enter into any transactions and make and obtain any commitments on behalf of [Springs Medical] deemed necessary or appropriate in his sole direction." After the Joint Action Document was executed, Joseph retained his shareholder status, but his day-to-day role was reduced to serving as a physician-employee.

On the same day that Congress signed the CARES Act into law, March 27, 2020, Joseph opened an unauthorized bank account in Springs Medical's name (hereafter, the "Unauthorized Bank Account"), making himself the sole signatory. His actions violated the terms of the Joint Action Document, which vested control of

practice finances in Papalini. Joseph, however, claimed he opened the Unauthorized Bank Account because of a dispute with Papalini over his leadership and business decisions. He took offense to Papalini's behavior and purportedly considered it wise to disguise his financial dealings in preparation to oust Papalini from practice operations.

On or about March 29, 2020, Joseph applied for AAP relief on behalf of Springs Medical without authorization from Papalini. He requested the maximum available loan and certified the request was due to billing complications caused by COVID-19. Notably, evidence presented at trial suggests no such complications were present at the time Joseph submitted his request. Joseph's application was approved and on April 7 the assigned lender made a payment of $86,747.11 to Springs Medical's authorized business bank account (hereafter, the "Official Business Account"). Within twenty-four hours, Joseph transferred $92,000 from this account to his minor daughter's bank account, which he controlled.

On April 3, Joseph applied for an unauthorized PPP loan in Springs Medical's name. His application listed his personal residence as the business address, used Springs Medical's Employer Identification Number ("EIN"), and sought $500,000 in assistance. He claimed $200,000 in monthly payroll, covering thirty-eight employees. The selected lender, Fountainhead Commercial Capital ("Fountainhead"), denied Joseph's application. It explained that another PPP loan request using Springs Medical's EIN had already been submitted. In fact, Springs Medical had previously tendered an authorized PPP loan application for $253,500.

Shortly thereafter, Springs Medical's office manager, Nicole Dennis, learned Joseph had removed funds from the Official Business Account following his successful AAP loan application. Dennis called Joseph, requesting he return the money so the practice could pay its employees. Joseph curtly refused. On April 14, 2020, Papalini terminated Joseph for transferring funds from the Official Business Account without approval. A week later, on April 21, Joseph filed a state-court civil lawsuit formally seeking to regain control of the practice. On May 7, 2020, the state court issued an order declaring that the Joint Action Document governed and Papalini controlled Springs Medical. Despite the order, Joseph appeared at Springs Medical on May 28 and attempted to fire Papalini in a last-ditch effort to take over the practice. Police arrived to diffuse the situation and Joseph left the premises unsuccessful.

On June 24, 2020, well after he ceded his financial duties and was formally severed from the practice, Joseph submitted another PPP loan application on behalf of Springs Medical. He represented himself as owner of the practice and requested $179,000 in relief. Instead of using Springs Medical's EIN, Joseph's application listed his own social security number. Despite his ouster, he claimed monthly payroll needs of $72,000, covering thirty-four employees. As to how the funds would be used, Joseph selected the "other" box on the application. He claims he believed this selection allowed him to utilize the funds outside the program's restricted spending categories. Although he knew otherwise, Joseph also certified that Springs Medical had not received a prior PPP loan. The loan processor, Kabbage, Inc. ("Kabbage"),

6

approved the application and issued $179,000 to the Unauthorized Bank Account Joseph set up in March. Joseph admitted to ultimately using the money from both successful loans for his own benefit. After channeling the funds to his personal accounts, he misspent the relief on a range of goods and services, including vacation, home improvement, car payments, rent, child support, personal legal expenses, and adult entertainment.

On March 17, 2021, a federal grand jury charged Joseph with four counts: embezzlement or theft of health care benefit program funds in violation of 18 U.S.C. § 669 (Count One); embezzlement or theft of government property in violation of 18 U.S.C. § 641 (Count Two); wire fraud in violation of 18 U.S.C. § 1343 (Count Three); and false statements in bankruptcy in violation of 18 U.S.C. § 152(3) (Count Four). The prosecution voluntarily dismissed Count Four prior to trial. Following a five-day trial in January 2023, the jury convicted Joseph of Count One, which was specifically predicated on fraud related to his AAP loan application; and Count Three, which was based on his misuse of the PPP loan system. The jury acquitted Joseph of Count Two. Joseph was sentenced to thirty months' imprisonment, followed by three years of supervised release. The district court also ordered Joseph to pay restitution of $86,717.11 to CMS and $179,999 to SBA.

### III.   Analysis

#### a.  Sufficiency of Evidence

This court reviews the sufficiency of evidence supporting a conviction de novo. *United States v. Anaya*, 727 F.3d 1043, 1050 (10th Cir. 2013). "We take the

7

evidence—both direct and circumstantial, and reasonable inferences drawn from that evidence—in the light most favorable to the government and ask only whether a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id*. (quotations and alteration omitted).

Count One of Joseph's indictment required for conviction that he "knowingly and willfully embezzle[d], st[ole], or otherwise without authority convert[ed] . . . , or intentionally misapplie[d] any of the moneys, . . . of a health care benefit program." 18 U.S.C. § 669; *United States v. Maynard*, 984 F.3d 948, 962 (10th Cir. 2020). Similarly, Count Three of the indictment for wire fraud required he intentionally "devise[d] any scheme or artifice to defraud, or . . . obtain[ed] money or property by means of false or fraudulent pretenses." 18 U.S.C. § 1343; *United States v. Hay*, 95 F.4th 1304, 1311 (10th Cir. 2024). Joseph asserts no direct evidence demonstrates he had intent to defraud or intentionally misapply funds from either federal relief program at the time he submitted his applications. Instead, Joseph claims his applications were intended innocently as a means of trying to regain control of Springs Medical from Papalini.

Given the facts in this case, this court does not disagree with Joseph's argument that focus must be on his intent at the time he submitted the applications. Importantly, however, he provides absolutely no authority to support his apparent contention that evidence of his actions before and after submitting the applications are not capable of demonstrating unlawful intent. Rather, "[b]ecause it is difficult to prove intent to defraud from direct evidence, a jury may consider circumstantial

8

evidence of fraudulent intent and draw reasonable inferences therefrom." *United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir. 2003); *see United States v. Magleby*, 241 F.3d 1306, 1312 (10th Cir. 2001) (collecting cases for same rule in non-fraud-based intent crimes); *see also United States v. Christy*, 916 F.3d 814, 843 (10th Cir. 2019) (highlighting importance of circumstantial evidence for determining intent under a sufficiency analysis). "[I]ntent may be inferred from evidence that the defendant attempted to conceal activity" and "[i]ntent to defraud may be inferred from the defendant's misrepresentations, knowledge of a false statement as well as whether the defendant profited or converted money to his own use." *Bailey*, 327 F.3d at 1140 (quotation omitted). It is the totality of the evidence, and the reasonable inferences drawn therefrom, which supports our sufficiency analysis. *See Anaya*, 727 F.3d at 1050. "Thus, even when a defendant, as here, denies having the requisite intent, a jury may disbelieve the defendant if his words and acts in the light of all the circumstances make his explanation seem improbable." *Magleby*, 241 F.3d at 1312 (quotation and alterations omitted).

Robust direct and circumstantial evidence exists to support Joseph's convictions on both counts. Contrary to Joseph's arguments, much of this evidence is contemporaneous to when he filed his applications. For instance, Joseph made numerous false certifications on the face of his applications, including that Springs Medical was suffering Medicare claims processing delays due to COVID-19; that he was authorized to apply for loans on Springs Medical's behalf; and that the business had not previously received a PPP loan. He also set up a fraudulent bank account in

the practice's name and moved tens of thousands of dollars from Springs Medical's Official Business Account into his daughter's account for the purpose of concealing his financial activity. He further attempted to disguise his transactions by using his home address on relief applications and by applying for funds under his social security number after learning that using the business's EIN would prove fatal. Additionally, it is undisputed that Joseph primarily used the relief money for his own benefit. In violation of program rules that he certified he understood, he spent handsomely on personal legal expenses, home improvement, and phone sex operators, among many other things. His actions were knowingly in violation of the Joint Action Document and further contravened an ensuing state court order enforcing that document. The extensive evidence of Joseph's misrepresentations, covert financial activity, and self-enrichment from the time of his applications and thereafter certainly supports a reasonable jury's conviction on both fraud counts. *Bailey*, 327 F.3d at 1140.

### b. Cross-Examination & Exhibit Introduction

We review challenges to district court evidentiary rulings for abuse of discretion. *United States v. Silva*, 889 F.3d 704, 709 (10th Cir. 2018). An abuse of discretion occurs when the district court "renders an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Id*. (quotation omitted). Under this standard, "we will not reverse the district court without a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible

choice in the circumstances." *United States v. Griffin*, 389 F.3d 1100, 1103 (10th Cir. 2004) (quotation omitted).

Joseph argues the district court made two meaningful and improper evidentiary rulings. First, he asserts the district court inappropriately denied him the opportunity to fully cross-examine SBA counsel, Mary Beth Cvengros, and Kabbage employee, Valerie Martin. Specifically, Joseph intended to emphasize on cross that Kabbage had a practice of inadequately vetting relief applications and, therefore, made it easier for Joseph to obtain funds without scienter. Joseph further hypothesized that federal investigation into Kabbage's due diligence practices impacted its motivation to participate in the trial. The district court determined Kabbage's impropriety did not illustrate or affect Joseph's underlying mens rea and refused further cross-examination on the matter. Second, Joseph claims the district court erred in denying his request to submit an exhibit of Springs Medical's authorized PPP loan from May 2020. Joseph suggested the exhibit would clarify the extent to which he was aware of a prior PPP loan when he applied for his second unauthorized loan in June 2020. The district court denied the introduction of the exhibit because it was not relevant to determining Joseph's intent and it risked misleading the jury. Instead, the district court permitted Joseph to testify to his understanding of the situation without the loan document for support.

District courts are given "broad discretion to limit the cross-examination" of witnesses. *United States v. Pearson*, 798 F.2d 385, 388 (10th Cir. 1986). Here, there was no "nexus" between Kabbage's shortcomings as a lender and Joseph's intent to

11

defraud federal relief programs. *United States v. Jones*, 213 F.3d 1253, 1261 (10th Cir. 2000); *see also United States v. John*, 849 F.3d 912, 918 (10th Cir. 2017) (holding limitation of cross-examination was proper when the proposed questioning was not "even marginally relevant" to the underlying issue at hand). Kabbage's history of imprecise application review and the federal investigation thereof do not remotely relate to Joseph's offenses. As the district court noted, it appears the desired cross-examination would serve only to deflect blame onto the lender. The negligence of another party "in failing to discover a fraudulent scheme," however, "is not a defense to criminal conduct." *United States v. Svete*, 556 F.3d 1157, 1167 (11th Cir. 2009) (quotation omitted). Absent a viable connection between Kabbage's behavior and Joseph's fraud, we conclude the district court's decision to limit the cross-examination of Cvengros and Martin was not arbitrary.

Similarly, whether to exclude evidence is within the "sound discretion" of the district court. *United States v. Perrault*, 995 F.3d 748, 764 (10th Cir. 2021). Here, the district court reasonably concluded the introduction of the PPP loan exhibit did little to illuminate Joseph's state of mind and would serve to support his unrelated theory that other people were at fault for his actions. *See generally United States v. Keck*, 643 F.3d 789, 795 (10th Cir. 2011) (upholding exclusion of exhibits on the grounds of "relevancy, waste of time, and confusion of the jury"). Further, this court struggles to find any prejudice in the district court's determination given that Joseph was fully allowed to present his desired evidence through his own testimony. *See id*. In turn,

12

we conclude the district court did not abuse its discretion by excluding the Springs Medical PPP loan exhibit.

### c. Expert & Lay Testimony

This court reviews a district court's decision to admit or exclude expert testimony for abuse of discretion. *United States v. Starks*, 34 F.4th 1142, 1170 (10th Cir. 2022); *see also* Fed. R. Evid. 702 (describing rules governing expert testimony). Generally, Fed. R. Evid. 701(c) ensures that lay testimony is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Lay witnesses are typically allowed to provide "observations that are common enough and require a limited amount of expertise, if any." *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011) (quotation and alteration omitted). "The prototypical example" of such evidence "relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences." *Id*.

At trial, the government offered "certified fraud examiner," Michael Petron, as a witness to explain Joseph's banking transactions. Absent an expert designation, the district court allowed the prosecution to use Petron as a lay witness, provided he limited his explanations to relatively rudimentary arithmetic. Although Petron's testimony largely relied on addition and subtraction, the scope of his testimony was broad and its content was detailed. After selecting a "conservative" methodology for tracking funds, Petron provided an in-depth portrait of "eight or nine" different bank

13

accounts based on analysis of "thousands of transactions." His testimony provided a thorough summary of how Joseph's various transactions related to one another and illustrated how the relief funds went from issuance to being spent on personal expenses.

When considering math, a lay witness is free to provide testimony that utilizes "basic arithmetic." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1057 (10th Cir. 2020) (holding that taking the median of several numbers qualified as basic); *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005) ("Taking a simple average of 103 numbers, though technically a statistical determination, is not so complex a task that litigants need to hire experts in order to deem the evidence trustworthy."). Testimony is no longer lay testimony, however, if it moves beyond basic mathematics by considering advanced topics or by requiring the selection of a mathematic methodology. *See James River Ins.*, 658 F.3d at 1214 ("Unlike taking an average, calculating depreciation requires more than applying basic mathematics. Technical judgment is required in choosing among different types of depreciation."); *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004) (classifying "moving averages, compounded growth rates, and S-curves" to be too technical for lay witness testimony). Still, merely possessing expert knowledge does not alone require a person to testify as an expert. *ORP Surgical, LLC v. Howmedica Osteonics Corp.*, 92 F.4th 896, 915 (10th Cir. 2024).

Petron's testimony went beyond the mathematic analysis permissible for lay witnesses in both scope and kind. Importantly, to conduct his testimony he had to

14

choose between multiple possible methodologies for tracing bank funds. Further, his testimony was based on a large-scale analysis of thousands of transactions across several different bank accounts. In Petron's own words, his testimony became "increasingly complex" as he described additional funds flowing across various accounts. This appears to be exactly the type of "technical, or other specialized knowledge" that is reserved for expert witnesses. Fed. R. Evid. 702(a). Indeed, this court is doubtful that Petron's testimony could be deemed within "the realm of common experience" as is required of lay testimony. *United States v. Draine*, 26 F.4th 1178, 1188 (10th Cir. 2022) (quotations omitted).

Nonetheless, "[a]n erroneous admission of evidence is harmless unless it had a substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." *United States v. Yeley-Davis*, 632 F.3d 673, 685 (10th Cir. 2011) (quotation omitted). Prejudice is unlikely to arise when the record already contains evidence encapsulating the erroneous admission. *See United States v. Pehrson*, 65 F.4th 526, 543–44 (10th Cir. 2023); *see also United States v. Charley*, 189 F.3d 1251, 1272 (10th Cir. 1999) ("In light of the strength of the properly admitted testimony, . . . we cannot say that the erroneously admitted portions of the testimony substantially affected the trial's outcome."). Here, bank records displaying Joseph's transactions were admitted as exhibits. More substantially, a separate government witness, Special Agent Cory Rumple, testified at length to the contents of the bank account records and described in detail the movement of funds through Joseph's bank accounts. Agent Rumple's testimony also covered Joseph's many expenditures of

15

relief funds on personal goods and services. Given that the jury received an alternative report of Joseph's financial activity which captured Petron's testimony, we conclude the district court's error of allowing Petron to testify as a lay witness was harmless.

### d. Rule 404(b) Evidence

"We review the district court's decision to admit evidence under [Fed. R. Evid.] 404(b) for abuse of discretion." *United States v. Commanche*, 577 F.3d 1261, 1266 (10th Cir. 2009). Rule 404(b) forbids evidence of other bad acts to prove a person's character, but it allows for such evidence to be admitted for the limited purposes of "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Generally, this court considers a four-factor test when determining the admissibility of evidence under Rule 404(b):

> (1) the evidence must be offered for a proper purpose; (2) the evidence must be relevant; (3) the trial court must make a [Fed. R. Evid.] 403 determination of whether the probative value of the similar acts is substantially outweighed by its potential for unfair prejudice; and (4) . . . the trial court shall, upon request, instruct the jury that evidence of similar acts is to be considered only for the proper purpose for which it was admitted.

*United States v. Davis*, 636 F.3d 1281, 1297 (10th Cir. 2011) (quotation omitted). We consider the admissibility of evidence under Rule 404(b) to be a "case-specific inquiry" and rely heavily on the district court's "broad discretion." *United States v. Henthorn*, 864 F.3d 1241, 1248 (10th Cir. 2017).

At trial, the government sought to introduce evidence that, after the events underlying the charges set out in the indictment, Joseph withdrew $241,000 in

16

Medicare funds from Springs Medical's Official Business Account without authorization in November 2020. Given Joseph's argument that he intended to repay the federal relief funds he previously took, the prosecution aimed to use his withdrawal and subsequent failure to repay as evidence that his applications were intentionally fraudulent. The district court accepted this explanation, determining the evidence was offered for the relevant purposes of showing Joseph's intent and lack of mistake. In its prejudice analysis, however, the district court recognized the withdrawal's potential to mislead the jury and, thus, restricted the use of evidence related to the event.[1] The district court further offered a limiting instruction when the evidence was presented.

This court cannot identify error at any step of the four-factor test used to analyze 404(b) rulings. The district court reasonably determined the government's proffered purpose was legitimate and relevant to the underlying fraud claims. *See United States v. Mares*, 441 F.3d 1152, 1157 (10th Cir. 2006) ("Subsequent acts evidence is particularly relevant when a defendant's intent is at issue."). The Medicare withdrawal was responsive to Joseph's defense and helped illustrate his earlier relief applications were not merely innocent requests he meant to refund when

---

[1] The district court excluded "the introduction of whatever evidence or transcript or recording there is, that establishes that his explanation for [the Medicare funds withdrawal] is a lie . . . in the case in chief." The court made this determination in part due to the Medicare funds withdrawal being "tied up" with the corresponding bankruptcy proceeding, which was only questionably relevant to Joseph's criminal proceeding. The court further concluded that allowing additional evidence on the matter could "drift into what is, essentially, propensity evidence."

17

the opportunity arose. The evidence was further relevant because it occurred in proximity to the crimes of conviction and was similar in nature to Joseph's prior financial misdeeds. *See Davis*, 636 F.3d at 1298 (noting the probative value of other acts under Rule 404(b) that are similar in time, place, and nature to the underlying offenses). The district court also engaged in a prejudice analysis under Rule 403, which resulted in a restriction of related evidence to prevent jury confusion. Finally, the district court offered an appropriate and complete limiting instruction when the evidence was presented at trial. *See, e.g.*, *United States v. Cardinas Garcia*, 596 F.3d 788, 798 (10th Cir. 2010) ("We presume jurors will conscientiously follow the trial court's instructions" (quotation omitted)). Accordingly, we are satisfied that the district court properly considered all necessary steps in its Rule 404(b) ruling and did not abuse its discretion in admitting the evidence.

### e. Jury Instructions

This court reviews the refusal to give a requested jury instruction for abuse of discretion and will reverse only if prejudice results from such a refusal. *United States v. Faust*, 795 F.3d 1243, 1251 (10th Cir. 2015). "In order to assess whether the court properly exercised its discretion, we review the jury instructions de novo to determine whether, as a whole, they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case." *Id.* (quotation omitted).

Joseph argues the district court erred by not specifically instructing the jury that failing to repay a debt is not a crime. He claimed that creating the distinction

18

between fraud and debt delinquency was fundamental to his defense. The district court declined the instruction, concluding that the government did not raise a failure-to-repay argument and the record did not otherwise support it. The district court further assured Joseph that it would exclude any argument which indicated nonpayment constitutes theft.

"[A] defendant is entitled to an instruction if the evidence viewed in his favor could support the defense." *United States v. Toledo*, 739 F.3d 562, 568 (10th Cir. 2014). Here, however, no evidence or argument supported the inclusion of the instruction. This court is not persuaded the instruction was necessary to Joseph's defense when it was unresponsive to any proposed argument, not relevant to the record, and the district court gave guarantees that any such argument would not be tolerated. *See United States v. Bader*, 678 F.3d 858, 873 (10th Cir. 2012) (similarly rejecting a jury instruction request that related to a "right . . . no way implicated" in the case). Given the proposed instruction's complete lack of relevance, Joseph did not endure any prejudice as a result of its exclusion. The jury was provided "an accurate understanding" of the case and, therefore, we conclude the district court did not abuse its discretion in declining Joseph's request. *United States v. Crockett*, 435 F.3d 1305, 1314 (10th Cir. 2006).[2]

---

[2] Joseph analogizes his case to *United States v. Britt*, 79 F.4th 1280, 1293 (10th Cir. 2023), which concluded the trial court "abused its discretion in refusing to instruct the jury on imperfect self-defense." There, this court emphasized the importance of "[g]iving full credence" to the defendant's testimony when deciding if an instruction is warranted. *Id.* at 1291. Unlike this case, however, *Britt*'s jury

19

### f. Loss Calculation

"When reviewing a district court's application of the Sentencing Guidelines, we review legal questions de novo and we review any factual findings for clear error, giving due deference to the district court's application of the guidelines." *United States v. Craig*, 808 F.3d 1249, 1255 (10th Cir. 2015) (quotation omitted). Here, Joseph challenges whether his first failed PPP loan application from April 2020 was relevant conduct as defined by U.S.S.G. § 1B1.3(a)[3] and, therefore, whether it should be included as "intended loss" under U.S.S.G. § 2B1.1(b)(1). The district court determined the similar nature, close proximity, and shared purpose of Joseph's first PPP loan request qualified it as relevant conduct to his later, successful application. It included Joseph's $500,000 loan request as intended loss, thereby increasing his assessment from § 2B1.1(b)(1)(G), covering offenses with losses exceeding $250,000, to § 2B1.1(b)(1)(H), covering offenses with losses exceeding $550,000. In turn, Joseph's offense level increased by two points.

Section 2B1.1(b)(1) contemplates both actual loss and intended loss. U.S.S.G. § 2B1.1 cmt. n.3(A). Intended loss includes "the pecuniary harm that the defendant

---

instruction request was responsive to arguments made at trial and was supported by sufficient evidence. *Id*. at 1291–92. In contrast, Joseph's request was not implicated by any argument made by the government, nor was it responsive to the evidence presented at trial.

[3] Joseph arguably forfeited this challenge by exclusively arguing on appeal that his prior PPP loan application was not relevant conduct under § 1B1.3(a)(1). The district court, however, made clear it included the failed loan amount under the provisions of § 1B1.3(a)(2). Because we resolve this issue on de novo review, we need not determine if Joseph forfeited his claim.

purposely sought to inflict." *Id.* at cmt. n.3(A)(ii). "In calculating loss under the Guidelines, the district court does not limit itself to conduct underlying the offense of conviction, but rather may consider all of the defendant's 'relevant conduct.'" *United States v. Griffith*, 584 F.3d 1004, 1011 (10th Cir. 2009). Relevant conduct for purposes of § 2B1.1(b)(1) includes "all acts and omissions committed . . . by the defendant" that "were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(1)–(2).[4] A "common scheme" is generally considered as two or more offenses that are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." U.S.S.G. § 1B1.3 cmt. n.5(B)(i); *see also United States v. Damato*, 672 F.3d 832, 845 (10th Cir. 2012). The "same course of conduct" refers to a more flexible set of acts that are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3 at cmt. n.5(B)(ii); *see also United States v. Garcia*, 946 F.3d 1191, 1203 (10th Cir. 2020) ("We have opined that this same-course-of-conduct standard looks to whether the defendant repeats the same type of criminal activity over time, but does not require that acts be connected together by common participants or by an overall scheme." (quotations omitted)).

---

[4] Section 1B1.3(a)(2) governs "offenses of a character for which § 3D1.2(d) would require grouping of multiple counts." Intended loss calculation under § 2B1.1(b)(1) is incorporated under § 3D1.2(d).

This court agrees with the district court's determination that Joseph's first failed PPP loan attempt qualifies as relevant conduct under either the common scheme or same course of conduct standard. Joseph's first application was a near replica of his later submission; it was completed only three months prior to his second application; it seemingly had the same purpose to defraud relief programs for his own benefit; and it shared the same victim. *See, e.g.*, *United States v. Smith*, 705 F.3d 1268, 1275 (10th Cir. 2013) (describing how a fraudulent housing sale based on fraudulent loan applications amounted to relevant conduct); *see also Damato*, 672 F.3d at 840–41 (looking favorably on temporal gaps substantially less than one year in analyzing same course of conduct qualifications). The two offenses are further correlated because Joseph's first failed application informed him how to successfully submit his second. After learning that using Springs Medical's EIN would result in a rejected application, Joseph used his own social security number in his second attempt.

Contrary to Joseph's arguments, there is no requirement that relevant conduct result in conviction when evidence fairly supports the presence of a common scheme or shared course of conduct. *See* § 1B1.3 cmt. n.5(A) ("Application of this provision does not require the defendant, in fact, to have been convicted of multiple counts."); *United States v. Altamirano-Quintero*, 511 F.3d 1087, 1095 (10th Cir. 2007) ("Relevant conduct for sentencing purposes, therefore, comprises more, often much more, than the offense of conviction itself, and may include uncharged . . . conduct." (quotation omitted)). Joseph's applications were virtually identical in nature and were

22

separated by only three months. Thus, we conclude Joseph's first PPP loan request was relevant conduct for purposes of the sentencing guidelines, and we perceive no clear error in the factual findings underlying the determination that he qualifies for an assessment under § 2B1.1(b)(1)(H).[5]

## IV.    Conclusion

The judgment of the United States District Court for the District of Colorado is hereby **AFFIRMED**.

---

[5] On appeal, Joseph additionally argued that the cumulative error doctrine should apply. *United States v. Garcia*, 74 F.4th 1073, 1130 (10th Cir. 2023) ("Cumulative error is present when the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." (quotation omitted)). Because there was but a single error, there could be no cumulative error.