**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 28, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

　　Plaintiff - Appellee,

v.

STETSON BRUCE,

　　Defendant - Appellant.

No. 23-7061

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:21-CR-00293-BMJ-1)**
_____

John C. Anderson, Santa Fe, New Mexico, for Defendant-Appellant.

Lisa C. Williams, Special Assistant United States Attorney, Muskogee, Oklahoma, (Christopher J. Wilson, United States Attorney, with her on the brief), for Plaintiff-Appellee.

_____

Before **HARTZ**, **EBEL**, and **ROSSMAN**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Defendant Stetson Bruce was convicted on two counts of aggravated sexual abuse in Indian country for sexually abusing his five-year-old son, R.W. The trial centered on the testimony of R.W. and his half-sister, E.R., who said she witnessed one of the acts. After both children testified and were cross-examined, the United

States District Court for the Eastern District of Oklahoma admitted into evidence the recordings of their forensic interviews, which were consistent with their trial testimony. These recordings were not played in the courtroom, but the jury was given access to them during its deliberations.

The primary question on appeal is whether the district court abused its discretion in admitting these two recordings. We conclude it did not. Both were admissible as prior consistent statements under Rule 801(d)(1)(B)(i) and (ii) of the Federal Rules of Evidence. By suggesting that R.W. had been coached by the prosecutor, the defense opened the door under romanette (i), allowing the government to rebut this charge via R.W.'s prior consistent statement. And by suggesting that E.R.'s memory was faulty, the defense opened the door under romanette (ii), allowing the government to rehabilitate E.R.'s credibility via her prior consistent statement.

Defendant also argues that reversal is required because the district court ruled prematurely on the admission of these recordings and because it committed structural error by sending them to the jury room rather than playing them in court. We find these arguments unpersuasive. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

R.W. moved in with Defendant, his father, in the summer of 2018. R.W. was then five years old. His seven-year-old half-sister, E.R., lived in Defendant's home as well.

At trial E.R. testified that she saw her father sexually abuse R.W. She recalled that she was making a grilled cheese sandwich when she heard her father and R.W. in her bedroom. She said it sounded like R.W. was "[k]ind of" screaming, so she went to check on him. R., Vol. III at 71–72. Peering through the cracked-open door, she saw her father's penis "touching" R.W.'s butt. *Id.* at 63, 65. R.W. was lying on his stomach, and her father had one hand on R.W.'s back, holding him down. Her father was clutching a can of compressed air in his other hand and was inhaling from it while he abused R.W.

Likewise, R.W. testified that his father had put his "teetee" inside his butt, and that this happened more than once. *Id.* at 128–30. He also recalled a time when he was lying on the couch in the front room, while his father touched his "teetee." *Id.* at 117–18.

On January 8, 2019, Michael Leonard of the Oklahoma Department of Human Services Child Welfare Department investigated Defendant's care of E.R. and R.W. Mr. Leonard testified that he interviewed both E.R. and R.W., but neither of them disclosed anything of concern. During his interview with Defendant, however, Defendant revealed that he had a problem with huffing compressed air. That evening the children were taken out of Defendant's care. R.W. returned to live with his grandmother, while E.R. went to live with her mother. The two children never saw or spoke with each other again.

Eventually E.R. returned to live with Defendant. His girlfriend also moved in around then. E.R. testified that at one point, about two years after the two children

had been removed from Defendant's care, she walked in on her father and his girlfriend having sex. She then reported this to her mother. At the same time, E.R. told her mother what she had seen her father do to R.W.

Not long thereafter, in February 2021, E.R.'s mother took her to a forensic interview. The interview was conducted by Lara Welch, the lead forensic interviewer with Sara's Project, a child advocacy center. In that interview E.R. said that she saw her father sodomize R.W. The description she gave in the interview closely matched the description she gave at trial.

In March 2021 Kailee Callahan, a licensed professional counselor under contract with the Oklahoma Commission on Children and Youth, conducted a forensic interview of R.W. After introducing herself and trying to make him feel comfortable, she showed him a cartoon of a boy's body and asked him to name various parts, including private parts. She then asked him if there are some body parts that are "not okay for other people to touch," and he circled the "teetee" and the "butt." R., Supp. Ex. 4 at 8:00–8:15. When she asked him whether anyone had ever touched him inappropriately, he denied it twice. She then changed the subject, asking him to tell her some things about his house that made him "feel safe." *Id.* at 9:15. But a couple minutes later, she asked him if he would feel safe telling someone if he or his siblings were touched inappropriately, and he said yes, "real safe." *Id.* at 11:00–11:32. Ms. Callahan then asked R.W. who he would feel safe telling besides his grandma, and he said, "my daddy—my new one." *Id.* at 11:33–11:45. After confirming with him that his "new dad's" name was Montana, she asked him, "Where's your old dad?" and he

responded, "Stetson? At his house, at home. He is mean, mean." *Id.* at 11:52–12:02.

Ms. Callahan followed up: "What does Stetson do that's mean?" R.W. sighed and

said, "I can't tell you, it's kind of disgusting." *Id.* at 12:19–25. She promised him that

he was in a "safe place," and he replied, "I'm just scared." *Id.* at 12:26–39. She

assured him again that he was "safe here," and asked, "Can you tell me what Stetson

does?" *Id.* at 12:40–13:10. He then disclosed that his father had repeatedly

sodomized him while he was living with him and described a separate incident in the

front room.

In August 2021 a grand jury in the United States District Court for the Eastern

District of Oklahoma indicted Defendant, charging him with two counts of

aggravated sexual abuse in Indian Country. *See* 18 U.S.C. §§ 2241(c), 2246(2)(A),

1151, and 1153. Shortly before trial, Defendant filed a motion in limine seeking to

exclude the recorded forensic interviews of E.R. and R.W. as hearsay. His motion

argued:

> [T]he interview is hearsay, *Rule 801 F.R. Evid.*, with no exceptions and
> is not admissible under the law. This statement is a statement made by a
> declarant, R.W. and E.R., not while testifying at the current trial or
> hearing and offered to prove the truth of the matter asserted. *Rule 801(c),
> F.R.Evid..* Hearsay is not admissible. *Rule 802, F.R. Evid..*

R., Vol. I at 80. Without waiting for a response from the government or conducting a

hearing, the district court denied the motion, ruling:

> Upon the presentation of proper foundation testimony, the Court will
> admit the forensic interviews into evidence. The interviews will not be
> played during the trial but will be included with all of the evidence
> admitted during the trial and given to the jury for use during deliberations.

*Id.* at 89.

Trial began on July 19, 2022. The prosecutor started her opening statement by quoting R.W.'s forensic interview: "How did it feel? So hard. How did it make your butt feel? Like I was sitting on metal burns. I was burning." R., Vol. III at 43. She said that this was "[a]n experience described by R.W. at the age of seven." *Id.* at 43. She added:

> How does this experience begin? With a big sister. E.R. . . . E.R. was talking to her mother. She tells her mom she saw her dad do nasty things to her brother. E.R. describes looking through a door, seeing her dad on top of her little brother anally raping him. . . . E.R. lived with the defendant for a long time. But E.R. went to live with her mom. And when E.R. went to live with her mom in Carter County, this is when she told [her] what happened. . . . [Her mother] takes E.R. to meet with a forensic interviewer at Sara[]'s Project . . . . That's how this process starts.

*Id.* at 44. Then she explained that R.W. had been forensically interviewed as well, and that R.W. "comes out to the forensic interviewer and tells her what the defendant did." *Id.* at 44–45. Defense counsel raised no objections to the opening statement.

E.R. was the first witness. On direct she testified about seeing her father sexually abuse R.W. During cross-examination defense counsel asked her about seeing her father and his girlfriend having sex, and about seeing her mother and her stepfather having sex. Defense counsel also questioned her memory of the incident, asking what time of day it took place, whether it was a workday or a weekend, which room it took place in, and whether she gave Defendant the grilled cheese sandwich she had been making. Defense counsel then asked her: "[Y]ou said this happened

three years ago . . . or two years before you told anybody? . . . It was a long time, wasn't it?" *Id.* at 88.

R.W. testified next and said that his father had sexually abused him. On cross-examination defense counsel posed the following questions: "How many times have you talked to [the prosecutor]? . . . And you and he talk about [the incident] a lot, don't you? . . . And he helps you with what you're saying, doesn't he?" *Id.* at 143–44.

Later that day the government called Kelsey Blevins, the lead forensic interviewer at the Child Abuse Network. She discussed the process of conducting forensic interviews of children in sexual-abuse cases. During cross-examination defense counsel asked Ms. Blevins whether "a child's answers about sexual activity could and sometimes in some instances [did] reflect prior exposure to sexual activities between adults?" *Id.* at 230–31. He then elaborated:

> Are there instances of children who have been exposed to sexual activities, either in person or by other means, where the child transposes persons in the experience—in the disclosure? . . . [I]f, for example, a child saw a certain sex act between person A and person B and two years later she attributes the sex act to person C and D, just simply changes parties, same dance?

*Id.* at 232.

On the second day of trial the government called Ms. Callahan, the counselor who had conducted the forensic interview of R.W. After questioning her and authenticating the recording of the interview, the prosecutor moved to admit it into evidence. Defense counsel objected, stating only that the interview was "hearsay,

repetition, cumulative, waste of time for the jury." *Id.* at 301. The prosecutor responded that R.W. had testified and his credibility had been attacked, so the interview was admissible under Rule 801. Defense counsel did not challenge this response. The district court overruled the objections and admitted the recording into evidence.[1]

Next the government called Ms. Welch, who had conducted the forensic interview of E.R. Again, after questioning her and authenticating the recording of the interview, the prosecutor moved to admit it into evidence. Defense counsel objected "based on our previous record." *Id.* at 330–31. The court overruled the objection and admitted the recording into evidence. Consistent with its pretrial ruling, the court informed the jury that the videos would not be played in the courtroom, but that the jury would have access to them during deliberations.

On the third day of trial, the jury returned a verdict of guilty on both counts. The district court sentenced Defendant to concurrent terms of life imprisonment on the two counts. He then timely appealed to this court.

## II.    DISCUSSION

"We review challenges to district court evidentiary rulings for abuse of discretion." *United States v. Joseph*, 108 F.4th 1273, 1281 (10th Cir. 2024). "Under

---

[1] Perhaps we could say that Defendant forfeited his argument that Rule 801(d) does not apply because he failed to explain why the government's response was inadequate. Our review would then be only for plain error. But the government does not argue that the issue was forfeited and we need not decide that issue because the record fully supports admissibility.

this standard, we will not reverse the district court without a definite and firm conviction that [it] made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (internal quotation marks omitted). "Our review is especially deferential when the challenged ruling concerns the admissibility of evidence that is allegedly hearsay." *United States v. Woody*, 45 F.4th 1166, 1178 (10th Cir. 2022) (internal quotation marks omitted).

### A.      Admissibility

On appeal Defendant pursues only his hearsay objection to the admissibility of the interviews. To begin with, Defendant correctly asserts that the district court did not explain its rationale for admitting the interviews. Neither in its pretrial order nor at trial did the court say whether the interviews fell outside the definition of hearsay, or whether a hearsay exception applied. But ordinarily "this court can affirm the district court's evidentiary rulings on any basis that finds support in the record." *United States v. McGlothin*, 705 F.3d 1254, 1266 n.17 (10th Cir. 2013); *see United States v. Enjady*, 134 F.3d 1427, 1434 (10th Cir. 1998) ("We may uphold a district court's evidentiary ruling on any ground supported by the record."); *United States v. Martinez*, 76 F.3d 1145, 1148 (10th Cir. 1996) ("We may uphold evidentiary rulings on any ground supported by the record, even if not relied upon by the district court." (internal quotation marks omitted)). And, in any event, we can assume that the district court simply accepted the government's nonhearsay argument, which was sound on its face and not rebutted by defense counsel.

Here, the record supports the admissibility of both recordings under Rule 801(d)(1)(B) of the Federal Rules of Evidence. Rule 801(d) provides:

A statement that meets the following conditions is not hearsay:

> (1) A Declarant-Witness's Prior Statement. The declarant testifies and is subject to cross-examination about a prior statement, and the statement:
>
> . . .
> (B) is consistent with the declarant's testimony and is offered:
>
>> (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or
>>
>> (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground[.]

It is undisputed that the threshold requirements of Rule 801(d)(1)(B) were met. R.W. and E.R. both testified, they were subject to cross-examination about the statements they made in their forensic interviews, and those prior statements were consistent with their in-court testimony. Thus, the only question is whether the prior consistent statements were offered for permissible reasons under romanette (i) or (ii). We conclude they were.

### 1.    R.W.'s Forensic Interview

Defendant contends that he "made little or no allegation of recent fabrication or improper motive," so R.W.'s forensic interview was not admissible under Rule 801(d)(1)(B)(i). Aplt. Br. at 22. He misreads the record. On cross-examination defense counsel asked R.W. "[h]ow many times" he had talked to the prosecutor, whether he and the prosecutor "talk about [the incident] a lot," and whether the

prosecutor "helps [him] with what [he's] saying." R., Vol. III at 143–44. The obvious purpose of this questioning was to suggest that the prosecutor was coaching R.W. In other words, the implication was that R.W. was "act[ing] from a recent improper influence or motive." Fed. R. Evid. 801(d)(1)(B)(i); *see United States v. Kootswatewa*, 893 F.3d 1127, 1134 (9th Cir. 2018) (concluding that a victim's prior consistent statements were admissible to rebut defense counsel's suggestion that her "in-court testimony had been tainted by a 'recent improper influence or motive'— namely, . . . alleged coaching").

We recognize that this rule "permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made *before* the charged recent fabrication or improper influence or motive." *Tome v. United States*, 513 U.S. 150, 167 (1995) (emphasis added). But the record is clear that R.W.'s forensic interview predated the alleged coaching. R.W.'s interview took place in March 2021, over a year before the July 2022 trial. At trial, defense counsel asked him—in the present tense—if the prosecutor "helps [him] with what [he's] saying." R., Vol. III at 144. Thus, the implied charge was that the prosecutor was *actively* coaching him—not that the prosecutor had coached him before his interview over a year earlier.[2] *Cf. United*

[2] Besides capturing defense counsel's present-tense coaching questions, the record also supports the government's contention that R.W.'s forensic interview took place "well before" a prosecutor was involved in the case. Aplee. Br. at 35. Defendant was not indicted until August 24, 2021, nearly six months after R.W.'s March 2, 2021 interview. And according to Ms. Callahan's trial testimony, the multi-disciplinary team involved in R.W.'s interview did not include any federal-

*States v. Magnan*, 756 F. App'x 807, 817 (10th Cir. 2018) (concluding that "prior consistent statements should not have been admitted" under Rule 801(d)(1)(B)(i) because defense counsel "did not imply that the victims' stories were *recently* fabricated" (emphasis added)). Because R.W.'s forensic interview "predate[d]" the alleged coaching, it offered a "square rebuttal of the charge" that R.W.'s trial testimony "was contrived as a consequence." *Tome*, 513 U.S. at 158.

Defendant also argues that the district court erred by failing to explicitly find that R.W.'s forensic interview took place before the prosecutor's alleged coaching. But because he raised this argument for the first time in his reply brief, he waived it. *See United States v. Salti*, 59 F.4th 1050, 1059 (10th Cir. 2023) ("The general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief." (internal quotation marks omitted)).

All told, we reject Defendant's challenge to the admissibility of R.W.'s forensic interview.

### 2.    E.R.'s Forensic Interview

Similarly, E.R.'s forensic interview was admissible under Rule 801(d)(1)(B)(ii), which permits the admission of prior consistent statements that are offered "to rehabilitate the declarant's credibility as a witness when attacked on

---

government attorneys. To be sure, R.W. testified on cross-examination that he had talked with the prosecutor "a bunch." R., Vol. III at 143, 145–46. And on redirect, after confirming that he had spoken with the prosecutor only twice before—both times in 2022—R.W. then contradicted himself, saying they had spoken more than twice. But neither statement at all suggests that he talked with a prosecutor *before* his interview.

another ground." The Advisory Committee Notes to the 2014 Amendment specifically identify "faulty memory" as one such alternative ground. *See* Fed. R. Evid. 801 advisory committee's note to 2014 amendment ("The intent of the amendment is to extend substantive effect to consistent statements that rebut other attacks on a witness—such as the charges of inconsistency or faulty memory.").

Recall that, on cross-examination, defense counsel asked E.R. several questions about her memory of the incident, pointing out that it had happened long ago. He also questioned her about seeing both her father and his girlfriend and her mother and stepfather having sex. And later, while cross-examining Ms. Blevins, defense counsel inquired if a child sometimes "transposes persons in the experience": "[I]f, for example, a child saw a certain sex act between person A and person B and two years later she attributes the sex act to person C and D, just simply changes parties, same dance?" R., Vol. III at 232. Given this record, Defendant concedes that he charged E.R. with having a faulty memory, at least to the extent that she had transposed her memory of walking in on him and his girlfriend into a memory of him abusing her little brother. *See* Aplt. Reply Br. at 11 ("[A]ccording to the Government, Defendant argued that 'E.R.'s memory of what she observed between Defendant and R.W. was faulty because she was transposing her memories of Defendant and [his girlfriend] into Defendant and R.W.' Resp. Br. at 31. True enough."); *see also* Aplt. Br. at 23 (noting that one of Defendant's "chief[]" trial strategies was "theorizing that E.R. may have transposed her observation of other sexual activity with observations of [him] and R.W.").

Defendant maintains, however, that he directed this line of attack at E.R.'s forensic interview in addition to her in-court testimony, so her prior consistent statements in the interview could not rebut the attack. But E.R.'s forensic interview occurred less than two months after she saw her father and his girlfriend having sex.[3] And when E.R. reported the abuse of R.W., she also told her mother about observing her father and his girlfriend having sex. The recency of the father-girlfriend episode, and E.R.'s speaking of the very different father-R.W. episode in the same

---

[3] In the defense's opening statement, defense counsel said that R.W. moved in with his father "around December" of 2018, so he was only there for about 30 to 60 days. R., Vol. III at 47. But R.W.'s grandmother testified that R.W. moved in with his father "before then"—in the summer of 2018—and lived there for five to six months. R., Vol. III at 290. On January 8, 2019, both children were removed from their father's care after he revealed to Mr. Leonard that he had a problem with huffing compressed air. E.R. must have witnessed the abuse of R.W. during that window.

Although the record does not provide many precise dates, it does suggest a timeline for the disclosure of the abuse. (We may consider the contents of the interviews themselves when addressing their admissibility, because courts are not bound by the rules of evidence when determining admissibility. *See* Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."); *Bourjaily v. United States*, 483 U.S. 171, 177–81 (1987) (explaining that under Rule 104(a) a court may consider hearsay statements themselves to make preliminary factual determinations regarding admissibility).). After being removed from her father's care, E.R. went to live with her mother. Later, she went back to either "visit" or "live with" her father, and it was at that point that she saw her father and his girlfriend having sex. In E.R.'s forensic interview, she mentioned being 10 years old at the time. E.R. then returned to her mother, told her about walking in on her father and his girlfriend, and, at the same time, told her that she witnessed her father abuse R.W. Learning of R.W.'s abuse then led E.R.'s mother to take her in for a forensic interview in February 2021—less than two months after she had turned ten years old. Thus, it appears that E.R.'s interview took place less than two months after she walked in on her father and his girlfriend.

conversation significantly weakens Defendant's transposition theory. A factfinder could reasonably decide that it was highly unlikely that she had mistakenly "transposed" the very recent girlfriend episode into the two-year-ago father-R.W. episode. E.R.'s forensic interview could therefore be used to rehabilitate her credibility.

In sum, E.R.'s forensic interview was admissible under Rule 801(d)(1)(B)(ii). *See United States v. Flores*, 945 F.3d 687, 705 (2d Cir. 2019) (affirming the admission of a witness's prior consistent statement under Rule 801(d)(1)(B)(ii) to rebut defense counsel's attacks that the witness's "recollection can no longer be trusted," even though the "challenges to [his] memory were brief and were not their main challenges" (internal quotation marks omitted)); *United States v. Cox*, 871 F.3d 479, 487 (6th Cir. 2017) (concluding that a child victim's prior consistent statement was admissible under Rule 801(d)(1)(B)(ii) because it "rebutted Defendant's attack on [the victim's] purportedly faulty memory").

Because we conclude that both interviews were admissible nonhearsay under Rule 801(d)(1)(B), we need not address Defendant's contentions that they were inadmissible under exceptions to the hearsay rule.

### B.    Timing

Defendant also argues that if the district court admitted the children's forensic interviews as prior consistent statements under Rule 801(d)(1)(B), then it abused its discretion by ruling on their admissibility before trial because it did not yet know how he was going to cross-examine the children. He contends that the court's

"premature ruling" deprived him of his ability to exclude the interviews by avoiding certain credibility attacks and allowed the government to improperly use the interviews in its opening statement. Aplt. Br. at 17–18. We disagree.

To begin with, the district court did not "preadmit" the forensic interviews in its order denying Defendant's motion in limine, as he concedes in his reply brief. *See* Aplt. Reply Br. at 2 ("The Government is correct that the district court 'never preadmitted the interviews.'"). Rather, the court said that the admissibility of the interviews was conditioned "[u]pon the presentation of proper foundation testimony." R., Vol. I at 89. Although Defendant reads *proper foundation testimony* narrowly—to include only the interviewers' testimony authenticating the recordings—he fails to explain why he thinks the court meant that. In general, the "foundation" for admitting evidence includes all the predicates that would render the evidence "proper[ly]" admitted. R., Vol. I at 89; *see United States v. Montague*, 958 F.2d 1094, 1096 (D.C. Cir. 1992) (concluding that a "foundation" was established to admit a statement under Rule 801(d)(1)(B) because the witness's credibility was attacked in a manner encompassed by the rule).

By the time the court actually admitted the forensic interviews into evidence, the "proper foundation[s]" under Rule 801(d)(1)(B) had been laid. R., Vol. I at 89. Both children had testified, both had been subject to cross-examination about their prior consistent statements, and defense counsel had insinuated that R.W. had been coached by the prosecutor and implied that E.R. had a faulty memory.

Nor did the court's pretrial ruling tie Defendant's hands. Had he refrained from making certain types of credibility attacks, the court could not have admitted the forensic interviews. But he made a different choice. *See United States v. Wells*, 623 F.3d 332, 345 (6th Cir. 2010) ("It is conceivable . . . that a defendant would refrain from making this type of credibility attack for the very purpose of preventing the admissibility of a prior consistent statement.").

Finally, the court's pretrial ruling did not give the government express permission to describe the forensic interviews in its opening statement. The government, too, made that choice itself. And, as it acknowledges, it "did so at its peril," risking a mistrial if the interviews were later ruled inadmissible. Aplee. Br. at 25–26. Moreover, defense counsel made no contemporaneous objections before, during, or after the government's opening.

To be sure, several circuits have found a prosecutor's mention of prior consistent statements in opening to be troublesome or improper. *See Wells*, 623 F.3d at 345 ("The prosecutor's remarks in her opening statement concerning the consistent pretrial statements . . . were risky if not improper."); *United States v. Simmons*, 567 F.2d 314, 321 (7th Cir. 1977) (government's mention of a prior consistent statement during its opening statement was "improper"). But in those same decisions, the courts concluded that there was no appreciable prejudice to the defendant, because the prior consistent statements were properly admitted into evidence later in the trial. *See Wells*, 623 F.3d at 346 (reasoning that "[a]ny potential prejudice that might otherwise have been inflicted upon Defendant by the [government's] remarks about prior

Page 17

consistent statements vanished" when the defense charged the witnesses with improper motive during its opening statement); *Simmons*, 567 F.2d at 322 ("What had first seemed to be inadmissible when mentioned during the Government's opening statement, thus later became admissible. No prejudice, therefore, resulted to the defendant."). So too here, when Defendant attacked E.R.'s memory and implied that R.W. had been coached, any potential prejudice stemming from the government's opening "vanished." *Wells*, 623 F.3d at 346.

We reject Defendant's claim of reversible error from any alleged jumping the gun by the district court or the government.

### C. Structural Error

Defendant's last argument is that the district court's decision to send the recordings of the forensic interviews to the jury room—without ever playing them in open court—amounted to a structural error. He does not contend that he was prejudiced by this decision; rather, he claims that he "need not demonstrate prejudice to be entitled to a reversal of his conviction." Aplt. Br. at 40. We are not persuaded.

The "general rule" is that "a constitutional error does not automatically require reversal of a conviction." *Greer v. United States*, 593 U.S. 503, 513 (2021) (internal quotation marks omitted). But the Supreme Court has recognized that certain errors, which "came to be known as structural errors," "def[y] analysis by harmless error standards." *Weaver v. Massachusetts*, 582 U.S. 286, 294–95 (2017) (internal quotation marks omitted). According to the Court:

Page 18

> The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. Thus, the defining feature of a structural error is that it affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself.

*Id.* (brackets and internal quotation marks omitted). The Court has concluded that an error is structural, and "thus subject to automatic reversal on appeal," "[o]nly in a very limited class of cases." *Greer*, 593 U.S. at 513 (internal quotation marks omitted). "The highly exceptional category of structural errors includes, for example, the denial of counsel of choice, denial of self-representation, denial of a public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

The Supreme Court has identified "at least three broad rationales" for why an error should be deemed structural in nature: (1) "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest"; (2) "if the effects of the error are simply too hard to measure"; and (3) "if the error always results in fundamental unfairness." *Weaver*, 582 U.S. at 295–96.

These principles must serve as our guideposts in determining whether an error is structural. Yet Defendant has utterly failed to explain how they show why the purported error here should be considered structural. He argues that sending admitted-but-not-played interview recordings to the jury room violated Rule 43 of the Federal Rules of Criminal Procedure (which requires that the defendant be present at "every trial stage"), not any of his "basic, constitutional guarantees." *Weaver*, 582 U.S. at 295. And he fails to explain how the district court's decision "affect[ed] the

*framework* within which the trial proceed[ed], rather than being simply a[] [possible] error in the trial process itself." *Id.* (emphasis added and internal quotation marks omitted).

Nor does Defendant try to explain how any of the three structural-error rationales apply here; and if there is some explanation, it is not obvious to us. First, he might have shown that his asserted "right"—to be present when the evidence was presented to the jury—served to protect some interest other than to avoid an erroneous conviction. *Id.* We recently said that the right to effective assistance of counsel was "derived solely to promote adversarial fairness," and therefore denial of that right would not be structural error. *United States v. Hohn*, 123 F.4th 1084, 1111 (10th Cir. 2024) (en banc). There is nothing in Defendant's briefs that might suggest why the error he asserts here should be treated differently.

Second, even if sending admitted-but-not-played recordings to the jury was an error, Defendant has not explained why its effects are "too hard to measure." *Weaver*, 582 U.S. at 295. We know exactly what prejudicial evidence the jury may have seen. *See Hohn*, 123 F.4th at 1110. We recognize that when a defendant is "denied the right to select his or her own attorney," there can be a cascading and incalculable impact. *Weaver*, 582 U.S. at 295. But Defendant has made no effort to explain why the impact of sending the jury two half-hour interview recordings at the end of the trial is likewise incapable of valuation.

Third, and finally, Defendant has not explained why sending admitted-but-not-played evidence would "always result[] in fundamental unfairness." *Id.* at 296. In

particular, the recordings in this case were properly admitted into evidence and Defendant had full opportunities to cross-examine the children interviewed. *See* R., Vol. III at 10–11 (before opening statements defense counsel confirmed with the court that "we can cross-examine on the whole tape, whether or not the jury hears it or not"); Aplt. Reply Br. at 10 ("Defendant's attack on R.W. and E.R.'s credibility was directed not only at their trial testimony, but with equal force at the statements each made in their forensic interviews.").

Rather than grappling with *Weaver* or *Greer*, Defendant relies on *United States v. Noushfar*, 78 F.3d 1442 (9th Cir. 1996). But that case preceded the Supreme Court's opinions in *Weaver* (2017) and *Greer* (2021), which more fully explicated the structural-error doctrine. In addition, unlike the case before us, those whose conversations were recorded in *Noushfar* apparently had not testified at trial. *See id.* at 1445 (playing the tapes in the jury room was "akin to allowing a new witness to testify privately, without cross-examination"). And the Ninth Circuit itself limited the scope of *Noushfar* even before *Weaver* and *Greer*, when it characterized the error in *Noushfar* as involving so many incriminating tapes (14) of conversations with the defendants that it would be "impossible for the reviewing court to determine the impact on jurors." *Eslaminia v. White*, 136 F.3d 1234, 1237 n.1 (9th Cir. 1998). That concern is absent here.

In short, Defendant has not shown that the district court committed a structural error by sending the admitted-but-not-played interview recordings to the jury room.[4]

## III.    CONCLUSION

We **AFFIRM** Defendant's conviction.

---

[4] Defendant also relies on *United States v. Magana*, where the issue facing the Seventh Circuit was whether the district court abused its discretion by declining to declare a mistrial after learning that the transcripts for over 200 audiotapes—which had been admitted into evidence but not played at trial—had been sent to the jury room. 118 F.3d 1173, 1181–83 (7th Cir. 1997). But the court affirmed the district court's decision, in part because "the transcripts and tapes had been *properly admitted in evidence.*" *Id.* at 1184 (emphasis added). And it merely assumed, rather than deciding, that the transcripts were "improperly before the jury." *Id.* This decision thus offers more assistance to the government than to Defendant.